254 So.2d 17 (1971)
E.R. SQUIBB & SONS, INC., a Delaware Corporation, Appellant,
v.
Clyde JORDAN and Goldie Jordan, His Wife, Appellees.
No. N-456.
District Court of Appeal of Florida, First District.
November 2, 1971.
Rehearing Denied November 19, 1971.
*18 Sanders, McEwan, Mims & McDonald, Orlando, for appellant.
Whitaker & Koepke, Orlando, and Landis, Graham, French, Husfeld, Sherman & Ford, DeLand, for appellees.
JOHNSON, Judge.
This is an appeal by the defendant below, E.R. Squibb & Sons, Inc., from an adverse jury verdict and final judgment awarding appellees $42,000.00 in compensatory damages for personal injuries.
As gleaned from the voluminous record on appeal and the briefs and oral arguments submitted by the parties, the relevant facts of this case are as herein set out. In 1964, appellee Goldie Jordan sustained a spinal injury as the result of an on-the-job accident which occurred in the course of her employment as a restaurant waitress. After a year of conservative treatment, her surgeon, E.D. Davis, M.D., determined that she needed corrective surgery consisting of a spinal fusion at three levels. The surgery involved an operation on the patient's low back, the removal of the laminae from the three vertebrae and the preparation of a trough or mortise bed in each, the placing of a piece of bone, obtained from some other source, across the three vertebrae and wedging said bone into position. The desirable result to be obtained by such an operation was that the graft bone would provide a bridge across which the patient's own system would construct new bone so as to cause a fusion or a union between the three vertebrae.
For the purpose of bridging the three joints, Dr. Davis chose to use beef bone, processed and sold by Squibb under the trade name and "Bo-plant". The operation was performed on March 1, 1966. Several months later, x-rays of appellee's spinal repair indicated that some portions of the original beef bone had disappeared, having been absorbed by the body of the patient, and that the fusion was unsatisfactory. Exploratory surgery was performed on April 15, 1967; inflamed reactive tissue at the "Bo-plant" site was discovered, with the "Bo-plant" not fused but walled off or encapsulated; and the "Bo-plant" was removed. The hospital's pathologist determined that the reactive type tissue was a result of a rejection of a foreign body, and that it was the incompatible cow protein which was the cause of the reaction. In 1968, Dr. Davis performed a refusion, using the patient's own bone, with good results. Dr. Davis stated that as a result of all the operations, Mrs. Jordan's recovery time was extended from six months to three years and her disability increased from 15 percent (a result of the original accident) to 20 percent.
Mrs. Jordon, joined by her husband, brought this suit for damages against Squibb on various grounds. While the complaint stated five grounds for recovery, only the issues of implied warranty and negligence were submitted to the jury. A verdict was returned which awarded the appellee wife compensatory damages of $35,000.00 and the appellee husband was *19 awarded $7,000.00 in compensatory damages.
The relevant evidence adduced at trial was that, at the time of Mrs. Jordan's first operation, there were three different types of bones which Dr. Davis could have used for the grafting procedure: (1) autogenous bone  bone coming from the patient's own body; (2) homogenous bone  human bone taken from another human being; and (3) heterogenous bone  bone from a species other than a human being (in this case, "Bo-plant"). It was established by experience, medical journals, and various other testimony and reports, that the order of effectiveness in grafting procedures such as this was autogenous, homogenous and then heterogenous bone, although at least one of appellant's witnesses testified that the use of "Bo-plant" proved to be as effective as homogenous bone.
As noted above, Dr. Davis determined to use the heterogenous bone called "Bo-plant", which was manufactured by Squibb. This was so even though he admitted that he had had "disastrous results" when using Squibb's baby beef bone in this type of operation on previous occasions. He stated that he had had over a 90 percent failure rate with some 50 other patients using "Bo-plant". Other testimony was presented by appellees as to the ineffectiveness of "Bo-plant" use by other medical personnel.
Squibb's testimony regarding the processing of "Bo-plant" revealed that it was tested on various animals for several years before entering the market. It was determined by Squibb that if the calf bone could be specially processed to remove the marrow elements and other antigenic factors, it would be safe and effective for use in human bodies. Processing techniques having been developed, their product was approved by the Federal Drug Administration for sale to the medical profession in November of 1964.
The remaining conflicting testimony by various experts and researchers who had used or worked with "Bo-plant" went to the effectiveness of "Bo-plant" as compared to autogenous or homogenous bone; the meaning of various tests and experiments conducted by Squibb and others; and the manner in which "Bo-plant" was obtained, processed, tested and distributed. While this testimony has been considered, it is not felt to be pertinent to the matters raised in this appeal to set forth all such testimony herein.
In addition to the specific issues raised in this appeal, appellant Squibb asserts that the primary issue in this case revolves around the "responsibility of a pharmaceutical house which does no more than attempt to make available to the medical profession a purified form of a natural material well known to the medical profession". It is contended that the lower court's judgment holds, in effect, that a pharmaceutical house which processes and sells a natural material for use by doctors will be responsible whenever a doctor does not get a successful result from the use of the product.
In contrast, appellees assert the primary issue to be whether or not "Bo-plant" was a safe and effective transplant material suitable for use in the human body as was represented by Squibb.
Specifically, Squibb contends that the trial judge should have directed a verdict for appellant since there was no evidence that there was a defect in the appellant's product. In the alternative, the jury should have been instructed, as requested, that it was incumbent upon the appellees to show a defect in the "Bo-plant" actually used on appellee Goldie Jordan. We disagree that a verdict should have been directed for Squibb, for the question of whether there was sufficient evidence to show a defect in the product was one for the jury.
As to the jury being instructed that, in order to find Squibb liable in damages for either a breach of implied warranty or negligence, a defect in the "Bo-plant" actually used on appellee must be *20 found; we are of the opinion that such an instruction should have been given and that to fail to give the instruction was reversible error which warrants a new trial.
Although the jury was instructed that negligence is failing to do something that should have been done or doing something that should not have been done which proximately injures another, there was no instruction regarding the requirement that a defect in the "Bo-plant" actually used upon appellee be found before Squibb could be held liable.
In a case for damages for a breach of an implied warranty, the plaintiff must show that the product was transferred from the manufacturer's possession while in a defective state, and as a result of the defect, the plaintiff was injured. Russell v. Community Blood Bank, Inc., 185 So.2d 749 (Fla.App.2nd, 1966). Under Florida law, the doctrine of implied warranty requires that there be shown an actual adulteration in the product before there can be liability for harm resulting from its use. Green v. American Tobacco Co., 391 F.2d 97, 111; 409 F.2d 1166 (5th Cir., 1969).
As pointed out in 79 A.L.R.2d 301, § 17, for a drug manufacturer to be held liable for harm allegedly caused by a product, regardless of the ground of liability asserted, it is necessary that it be shown that there was actually something wrong with the product used  for example, that the defendant furnished a product different from what was ordered, that the defendant negligently compounded the product, or that the product, although ostensibly harmless, was actually poisonous.
Even if this were a case involving strict liability in tort, the defective condition of the product would have to be shown. 13 A.L.R. 3rd 1057, §§ 5, 6.[1]
In short, whatever form of liability is pursued, whether it be warranty, negligence or strict liability, the appellee's injury must have been caused by some defect in the product, Royal v. Black and Decker Manufacturing Co., 205 So.2d 307 (Fla. App.3rd, 1967), and the jury should have been so instructed.
Appellant Squibb further challenges the trial court's instructions to the jury regarding the issue of damages. The jury was instructed that they should determine which portion of Mrs. Jordan's condition resulted from an aggravation of her previous injury; and, if they could not make that determination or if it could not be said that the condition would have existed apart from the injury, they could consider and make allowance in the verdict for the entire condition. We think such a charge was erroneous in light of appellee's treating physician's testimony that she sustained a 15 percent permanent disability as a result of the original accident, separate and apart from any disability relating to the use of "Bo-plant", and that the additional impairment due to the use of "Bo-plant" was 5 percent more. There was no other evidence which tended to indicate that the use of "Bo-plant" was responsible for more than 5 percent of Mrs. Jordan's disability. There being no evidence from which the jury could find an aggravation of the preexisting condition in excess of the 5 percent as testified to by Dr. Davis, it was error to submit this issue to the jury and instruct them that they could make allowance in the verdict for the entire condition.
We have considered the remaining issues raised in this appeal and find them to be without merit.
*21 For the reasons hereinabove stated, the judgment of the trial court is reversed and the cause is remanded for a new trial, in which trial the trial court shall be guided by the dictates of this opinion.
Reversed and remanded.
RAWLS, J., concurs.
SPECTOR, C.J., dissents.
SPECTOR, Chief Judge (dissenting):
I respectfully dissent from the holding by the majority opinion that the failure to give appellant's requested instruction on proximate cause was reversible error. In my view, the trial court adequately instructed the jury on the law of proximate cause. The record reflects the following instructions were given:
"Negligence is a legal cause of injury or damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such injury or damage, so that it can reasonably be said that but for the negligence the injury or damage would not have occurred."
The court also gave the following instruction:
"In order to be regarded as a legal cause of injury or damage, negligence need not be the only cause. Negligence may be a legal cause of injury or damage even though it operates in combination with the act of another, some other cause, if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such injury or damage."
The two jury instructions on proximate cause quoted above conform to instructions numbers 5.1a and 5.1b approved by the Supreme Court Committee on Standard Jury Instructions. The language expresses the essential elements of proximate cause without use of that term which is said to be misunderstood by juries. For the sufficiency of the instruction to express the essential elements of proximate cause, see this court's opinion in Pope v. Pinkerton-Hays Lumber Company, Fla.App., 120 So.2d 227, cert. den. Fla., 127 So.2d 441. This court recently rendered a decision touching on the question of whether failure to give requested instructions on the issue of proximate cause constitutes reversible error where the standard instruction on that issue was given. We held not. The reasons for that holding as set out in Judge Wigginton's opinion are sufficient to justify the rejection of appellant's requested instruction and the giving of the standard instruction by the trial court. See Florida East Coast Railway Co. v. McKinney, 227 So.2d 99 (Fla.App. 1969).
The evidence presented to the jury to support the jury's finding of proximate cause under the standard jury instruction was ample. Dr. Davis, the treating physician testified that when he conducted exploratory surgery after it became apparent that the use of appellant's product was not only unsuccessful but had produced a harmful effect, he found extensive reactive tissue at the site of the bone implant. He stated that the tissue in the area was edematous and inflamed, and the doctor also opined that the reactive tissue prevented a successful fusion. The hospital pathologist testified that the tissue in question was a reactive type and the latter witness testified that he came to the conclusion that this was caused by a reaction to a foreign body, a rejection, and that it was the incompatible cow protein which was the cause thereof. Upon being interrogated as to the cause of the reactive tissue, the pathologist testified, "It was the protein element of the animal itself". Describing the inflammatory reactive tissue, Dr. Davis stated, "It is rotten type tissue". Another witness, one of four research medical doctors at Case Western Reserve University Orthopedic Research Laboratory evaluating appellant's Bo-plant product under a federal government grant, gave his opinion based on his observations and tests on *22 twenty-one dogs that the product was not suitable for use in human beings.
The above testimony is supportive of appellee's claim that appellant breached its warranty that the Bo-plant product was a safe and effective bone-grafting implant material composed of sterile heterogenous processed bone or cartilage obtained asceptically from calf embryos and young calves, and that it had been subjected to a special processing which materially reduced the antigencity of the bovine bone and cartilage, thus affording suitable material for grafting procedures requiring bone or cartilage implants in orthopedic surgery.
In addition to dissenting from the views of my colleagues on the effect of the trial court's failure to give the requested instruction on proximate cause, I also dissent from the view expressed in the majority opinion that the instruction given by the court on the issue of aggravation of a pre-existing condition was erroneous. In my view, the instruction given in this regard was adequate.
I would affirm the judgment.
NOTES
[1] In connection with this theory, see § 402A, Second Restatement of Torts, Comment k, which notes as an exception from the strict liability concept various new or experimental drugs which, because of lack of time and opportunity for sufficient medical experience, cannot be considered as being absolutely safe for human consumption, although available experience justifies the marketing and use of the drug notwithstanding a medically recognized risk. McLeod v. W.S. Merrell Co., Div. of Richardson-Merrell, 174 So.2d 736 (Fla. 1965).