274 So.2d 898 (1973)
E.R. SQUIBB & SONS, INC., a Delaware Corporation, Appellant,
v.
Shirley STICKNEY, As Executrix of the Estate of David F. Stickney, Deceased, Appellee.
No. R-50.
District Court of Appeal of Florida, First District.
March 8, 1973.
Rehearing Denied April 10, 1973.
*899 Chester Bedell and Robert P. Smith, Jr., of Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, and Sanders, McEwan, Mims & McDonald, Orlando, for appellant.
Hoffman, Hendry & Parker, Orlando, and Alan R. Schwartz, of Horton, Schwartz & Perse, Miami, for appellee.
WIGGINTON, Judge.
Defendant has appealed a judgment based upon a jury verdict awarding plaintiff both compensatory and punitive damages.
The controlling facts in the case are not in material dispute. Appellee's decedent, David F. Stickney, sustained a lower back injury in an automobile accident on June 17, 1966. He consulted one Dr. Davis, an orthopedic surgeon practicing in Daytona Beach, and it was determined that he had suffered two herniated discs which required laminectomies of the L4 and L5 vertebrae and a spinal fusion to prevent the recurrence of residual pain from the *900 disc removals between the L4, L5, and S1 levels. The operation was performed by Dr. Davis on July 26, 1966, in which the product, Boplant, produced and sold by appellant-Squibb, was used as grafting material and was obtained from a shipment previously supplied to Halifax Hospital in Volusia County where the operation took place. The surgical procedure performed on Stickney appeared to be satisfactory, and he was discharged from the hospital in due course.
Three years following his operation Stickney returned to Dr. Davis with recurring back pain. X-rays showed a marked resorption of the graft, so another operation was performed by Dr. Davis on September 3, 1969, and the Boplant originally implanted in Stickney's spine was removed. It was found that the implant material was not united to the vertebrae nor was it replaced by new bone. Surgical investigation revealed that the graft was practically eaten away, was thinned down to one-third of its original thickness, and was encircled by fibrous membrane. The graft failed because the implant material had been rejected and isolated as a result of an antigen-antibody response to the implant material itself. A refusion was performed by Dr. Davis in which he used bone taken from Stickney's body, which operation proved successful.
Stickney brought this action against Squibb and claimed damages suffered by him as a result of the use of Squibb's product, Boplant, in his initial operation. His cause of action was based upon the alternative allegations of negligence, breach of implied and express warranty, and fraud. The jury returned a verdict awarding compensatory damages in the amount of $70,000.00 and punitive damages in the amount of $500,000.00, upon which judgment was entered. It is from that judgment that this appeal is taken. During the pendency of this appeal Stickney died and his personal representative has been substituted in his place as party appellee herein.
Since Stickney's cause of action revolves around the use by him of a product produced and sold by appellant, a review of the record concerning the development, manufacture, and sale of the product is in order. From the evidence it appears that for many years medical science has been intensely interested in developing a process by which animal bone might be made suitable for implantation in the human body in connection with orthopedic bone grafting procedures. The desirability of developing a processed animal bone for this purpose stems from two primary considerations. The most desirable bone implant as a grafting material is what is known medically as autogenous bone taken from one part of the patient's body and implanted in another part of the body where the defect exists. The advantages of this type of bone implant is that it normally will not produce an antigen-antibody reaction in the implant site and possesses an osteogenic or bone-making capacity of its own which complements that of the host bone in producing a successful graft. The procedure for utilizing autogenous bone has marked disadvantages, however, in that it requires two operations simultaneously at different sites in the patient's body; such second operation presents possibilities of infection, discomfort, morbidity, and other harmful effects. Another type of bone grafting material used in orthopedic bone grafting procedures is known medically as homogenous bone. This type of bone is taken from another human being and procured either from a live donor or from a bone bank in which the bones of deceased humans are stored. The utilization of homogenous bone in orthopedic procedures is highly impracticable because of the lack of donors, the scarcity of bone banks over the country, and the difficulties experienced in storing and preserving the bone until needed. It is because of the disadvantages and undesirable results which flow from the use of both autogenous and homogenous bone as grafting material that efforts were made over a period of many years to develop *901 a process whereby readily available animal bone could be made acceptable for this purpose.
In response to the foregoing need, Squibb inaugurated in the 1950's a program of studies and experiments with bovine bone in an effort to develop a process which would make it a useable implant material in orthopedic bone grafting procedures. Bone of this type is characterized by the medical profession as heterogenous bone to distinguish it from the other two types of bone taken from human beings. It is an established fact that bovine bone contains a high degree of protein known as antigens. When the bone containing such antigens is implanted in another animal or a human being, the body produces antibodies which cause a rejection reaction resulting in an incapsulation of the implant bone and its resorption by the bodily processes of the host tissue. Such reaction which normally occurs as a result of the protein-containing antigens present in the implant bone causes the graft to fail. The research which Squibb undertook was directed toward the development of a process whereby the major antigens in the calf bone could be extracted without significantly altering the mechanical or biological properties of the bone to such a degree as to render it useless as a grafting material. By a series of clinical studies and laboratory experiments with both animals and human beings extending over a number of years, Squibb developed a process by which practically all of the antigen properties normally present in the bone of a baby calf were removed, leaving a nearly sterile bone for use as an implant material. The testimony of the medical scientists is to the effect that only by further subjecting the processed bone to boiling under intense heat could it be completely freed of all antigen properties, but to do so would destroy the structural qualities of the bone and its use for the purpose intended.
In its laboratory experiments and clinical tests Squibb confined its efforts to the development of four different forms of implant material for use in different types of surgical procedures. One form was the cortical strip consisting of the outer layer or bark of the bone; another was the cancellous slab consisting of the spongy cellular mass beneath the bark; another was the ground cancellous slab which consisted of cancellous bone ground into small granules; and, finally, the rib matchsticks composed of a sandwich-like arrangement with cortical bone on each side and cancellous bone in the center.
In the first human clinical trials conducted by Squibb, its processed implant material in all its various forms was used by 27 orthopedic surgeons in performing operations on 400 patients. The clinical success rate attained in these 400 cases was reported by the surgeons to have been in excess of 90%. A similar success rate had previously been experienced by independent research scientists as well as Squibb's research staff in the performance of orthopedic procedures on animals. The results of these clinical experiments were widely publicized in medical journals, in published manuscripts and summaries, and in papers read at medical seminars over the country.
After Squibb had developed its process to the highest degree attainable by it at the time, it applied to the Food and Drug Administration of the United States in February, 1962, for authority to commercially produce and offer for sale its newly developed product to be marketed under the trade name of Boplant. Squibb's application recited in detail the source, composition, processing, and testing of its product. For the next approximate 2 1/2 years the FDA made consecutive demands and requests upon Squibb for more complete detailed information, explanations, specifications, and clinical test data concerning the process developed by it and the product for which approval was sought. After studying and verifying such data and satisfying itself as to the safety and effectiveness of Boplant for use as a bone grafting material in orthopedic surgical procedures, the FDA issued its formal approval of *902 Squibb's application on November 9, 1964. This approval was subject only to proper labeling and packaging of the product as might later be recommended by the FDA. Accordingly, Squibb included as an insert in its packaged product a warning statement and other information recommended by the FDA concerning the use of Boplant.
After receiving approval from the FDA on November 9, 1964, and prior to February, 1966, Squibb processed and commercially distributed more than 23,800 market packages of Boplant which included 5,253 packages of cortical strips. (Attention is focused on this form of Boplant because it was the type used by plaintiff-Stickney's orthopedic surgeon in the operation which forms the basis of this action.) The record reveals that by February, 1966, Squibb had reported to the FDA that its product, Boplant, had been used in various surgical procedures on an estimated 11,371 patients. Of this number Squibb had received and transmitted to the FDA summary clinical reports on 3,187 orthopedic patients. The clinical results on these patients, as reported by their surgeons to Squibb and by Squibb to the FDA, were successful in more than 90% of the cases. In addition, eleven members of the orthopedic staff of the University of Washington School of Medicine in Seattle performed 500 surgical implantations of Boplant in patients whose progress was followed postoperatively from 7 to 52 months. These Seattle orthopedists reported a Boplant success rate of 84%, which experience was related on January 25, 1966, to the annual meeting of the American Academy of Orthopedic Surgeons in Chicago.
From time to time after commercial distribution of Boplant was commenced by Squibb in 1964 approximately 150 complaints were received from surgeons using various forms of Boplant material in bone grafting procedures. These complaints arose from the approximately 11,000 patients who received Boplant implants in surgical operations through January, 1966. A great preponderance of such complaints resulted from the use of ground cancellous Boplant in which transient or persistent serous drainage at the implant site, infection, fever, and clear graft rejection were experienced. Only a relatively few of the approximately 150 complaints resulted from the use of cortical strips such as were used in the operation involved in the case sub judice. All such complaints were immediately reported by Squibb to the FDA. Because of such complaints which became generally known to members of the medical profession, the utilization of Boplant in orthopedic procedures was discontinued by several hospitals over the country and by a number of surgeons whose operations with Boplant had not proved successful. In addition, the Surgeon General of the Army reported to the FDA that Boplant had been used in orthopedic procedures on the legs of two patients in a military hospital. Admittedly, the legs of each patient were highly malignant and the implant material was rejected by the patient's body, causing the grafting procedure to result in failure. On the basis of the experience had with these two cancer-ridden patients, the Surgeon General reported that he had discontinued the use of Boplant in all military hospitals.
Since the preponderance of complaints received by Squibb related to the use of ground cancellous slabs as implant material, commercial production and distribution of this form of Boplant were discontinued in November, 1965, and remaining inventories of the product were retrieved from hospitals throughout the country. No comparable results were experienced when the operation was performed by using cortical strips. Squibb continued its research in an effort to further perfect its process by completely eliminating all residual antigens from its finished product, which, if accomplished, would greatly minimize the chance of surgical failure. Squibb reported the progress of its research to the FDA, but the results were not promising. Because of the reports of those cases in which the use of Boplant had not resulted in a successful *903 bone graft, thereby rendering it unsatisfactory to a segment of the medical profession, and in view of the mounting costs of research, development, and manufacture, Squibb made a policy decision to discontinue the commercial production and sale of Boplant on July 8, 1966. This decision was voluntarily made by Squibb, and at no time prior thereto had the FDA requested such action or taken any steps toward ordering Squibb to cease and desist the production and sale of its product because of the success-failure rate experienced in its use.
By its appeal Squibb challenges the sufficiency of the evidence to support the verdict rendered against it. It contends that the record contains no substantial evidence which establishes directly or by inference that the processed cortical calf bone known as Boplant which was employed in Stickney's vertebral fusion contained any defect or actual adulteration resulting in injury to Stickney. Appellant urges that in the absence of such proof, the judgment against it should not be permitted to stand.
In the case of E.R. Squibb & Sons v Jordan[1] this court had before it for review a final judgment which awarded to the plaintiff, Jordan, damages allegedly resulting from the use of Squibb's Boplant in an orthopedic surgical procedure performed on her. In expressing what we considered to be the law concerning the burden of proof required of the plaintiff in that case, we held in an opinion authored by Judge Johnson as follows:
"As to the jury being instructed that, in order to find Squibb liable in damages for either a breach of implied warranty or negligence, a defect in the `Bo-plant' actually used on appellee must be found; we are of the opinion that such an instruction should have been given and that to fail to give the instruction was reversible error which warrants a new trial.
* * * * * *
"In a case for damages for a breach of an implied warranty, the plaintiff must show that the product was transferred from the manufacturer's possession while in a defective state, and as a result of the defect, the plaintiff was injured... . Under Florida law, the doctrine of implied warranty requires that there be shown an actual adulteration in the product before there can be liability for harm resulting from its use... ."
The primary question with which we are now concerned is whether the evidence is sufficient to establish that the Boplant produced by Squibb and used in Stickney's operation was transferred from Squibb's possession to the Halifax Hospital in a defective state and that, as a result of the defect, plaintiff was injured. In other words, does the proof establish that the bone grafting material in question was actually adulterated and unfit for use in human beings when it left Squibb's manufacturing plant for shipment to the Halifax Hospital? This case cannot be analogized with those involving the principle of products liability in which a plaintiff is injured by a mouse found in a soft drink bottle, a stone in a can of beans, or a needle in a box of crackers;[2] nor to cases in which worms have been found in a can of spinach;[3] nor pins in a candy bar;[4] nor poisonous bacteria in a can of meat.[5] We have here a case in which appellee-Stickney does not base his cause of action upon the contention that the particular package of Boplant used in his operation was unexpectedly *904 found to be defective, had by some unknown means become adulterated before it left Squibb's possession, and was unfit for use as a bone implant material in the human body. On the contrary, he bases his right to relief squarely upon the contention that Boplant material in all its forms produced and sold by Squibb was inherently defective at the moment of its production and packaging because the residual antigens present in the implant material rendered it useless for bone grafting purposes and unfit for use in surgical operations on human beings.
Prior to the development and use of Boplant, the most common form of implant material used by orthopedic surgeons was autogenous bone taken from the body of the patient. This was the implant material customarily used by Dr. Davis in his orthopedic procedures. The evidence establishes that although autogenous bone is free of harmful antigen properties present in animal bone, nevertheless the rate of surgical failure experienced from the use of autogenous bone by orthopedic surgeons ranges from 10 to 15%. Dr. Davis himself testified that operations performed by him with the use of autogenous bone resulted in failure of the bone to produce a successful graft in from 10 to 15% of his patients. In addition, Dr. Davis had the same experience as most other practicing orthopedic surgeons with the dangerous and harmful effects which invariably resulted from the second operation on the patient's body to remove the bone from one site to be used as implant material in the site of the graft.
The evidence further establishes without dispute that after Boplant was developed and marketed by Squibb, its use as implant material in several thousand cases on which Squibb received clinical reports experienced a rate of failure ranging between 10 and 15%. On an average, the number of failures which occurred when Boplant was used compared favorably, if not almost identically, with the rate of failures experienced when autogenous bone was used. The clinical reports reflecting the success-failure rate in surgical operations using Boplant were made a matter of record with the FDA and were widely publicized among members of the medical profession and well known to every prudent and qualified orthopedist.
The selection of Boplant as the implant material to be used in Stickney's operation was made by his surgeon, Dr. Davis. In making such decision, this physician was not in the position of an uninformed layman who enters an apothecary shop for the purpose of buying a patent medicine to alleviate his discomfort and is influenced in his selection by the claims printed on the outside of the package or heard by him in television commercials. He was called upon to make a highly technical decision requiring a thorough inquiry into and a professional evaluation of the composition and propensities of heterogenous bone grafting material, including Boplant, and the results theretofore experienced in its use. There was open to him the choice of using as grafting material autogenous bone taken from another site in Stickney's body, in which event he would not only subject his patient to the dangerous and harmful effects of a second operation but would also assume the risk of a 10 to 15% chance that the procedure would be a failure. On the other hand, he had the alternative choice of using Boplant as the implant material, in which event a second operation would be obviated and the risk of failure no greater than that assumed if autogenous bone were used. At no time did Squibb claim either in its representations to the FDA or in its publicity releases to the medical profession that Boplant was entirely free of all harmful antigen properties or that it would effect a successful bone graft in 100% of the operations in which it is used in the bodies of human beings. Quite to the contrary, Squibb reported to the FDA the success-failure rate revealed by the clinical studies and laboratory experiments conducted by it. It also promptly reported the complaints of failures received *905 by it from others, and such information was widely publicized and became a matter of general knowledge to all informed and qualified orthopedists engaged in the bone grafting business. When appellee's surgeon elected to use Boplant as the grafting material in his operation on appellee, he necessarily assumed the risk that there was a 10 to 15% chance that the operation would not result in a successful bone graft; however, there remained an 85 to 90% chance of success, in which event the dangerous and harmful effects of a second operation would be avoided. There is no evidence that the cortical strip of Boplant used in Stickney's operation was any more defective or adulterated than any other Boplant material produced and distributed by Squibb and used by other orthopedic surgeons throughout the country. It met Squibb's specifications, the FDA's specifications, and all known standards of the pharmaceutical industry. It was no different in composition or purity than the same type material used in other operations which had experienced an 85% success rate in its use throughout the country. It came to Dr. Davis' hands in a flawless vial under a proper vacuum which had been assured by Squibb's complete inspection of each lot of Boplant bone in any form.
In the case of Royal v. Black and Decker Manufacturing Company,[6] the Third District Court of Appeal, in an erudite opinion authored by Judge Swann, made a scholarly review of the origin and development of the law relating to products liability. In this opinion the court pointed out:
"Distinctions between the various doctrines of product liability as they presently exist frequently have more theoretical than practical significance. Whatever form of liability is pursued  whether it be negligence, warranty, or strict liability  certain common denominators are inescapable.
"At the heart of each theory is the requirement that the plaintiff's injury must have been caused by some defect in the product. Generally, when the injury is in no way attributable to a defect, there is no basis for imposing product liability upon the manufacturer. It is not contemplated that a manufacturer should be made the insurer for all physical injuries caused by his products. See e.g. Restatement 2d, Torts, § 402A, comment g... .
* * * * * *
"The primary concern is to protect the user from the unreasonably dangerous product or from one fraught with unexpected dangers. For more extended treatment of the concept of defect see Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965); Freedman, `Defect' in the Product, 32 Tenn.L.Rev. 323 (1965). There is no requirement upon the manufacturer beyond this, however, to make an accident-proof or foolproof product."
So it is in the case sub judice that by the production and sale of the product, Boplant, Squibb did not become the absolute insurer that every orthopedic surgical operation in which Boplant was used as an implant material would result in a successful bone graft. Because of the very nature of the heterogenous bone from which Boplant was produced, every informed member of the profession knew that there remained in the finished product residual antigens which Squibb's process was unable to completely extract and which, when implanted in the bodies of some human beings, set into motion an antibody rejection process which caused the operation to result in failure. The fact that such possibility existed and actually occurred in a relatively small percentage of cases did not render the material inherently defective or unfit for bone grafting purposes when implanted in the human body.
*906 Appellee asserts that he sufficiently proved that Boplant was inherently defective and unfit for use in human beings by establishing that the cortical strip implanted in his body was rejected because of the presence in the material of unwanted antigenicity resulting in an antigen-antibody response which caused an incapsulation of the graft and a destruction of its mass. The proof shows that the symptoms experienced by Stickney and the cause of the failure of his initial operation were substantially the same as those experienced by other physicians in 10 to 15% of the surgical operations in which Boplant was used and failed. The fact that Stickney's operation fell within the group of 10 to 15% orthopedic failures experienced by other patients in which Boplant was employed is not competent proof of the fact that the material was inherently defective or unfit for use in operations on human beings. Squibb's promotional advertising, which had been noted by Stickney's surgeon prior to the operation, represented Boplant as a bovine bone for surgical use which had been subjected to special processing which markedly reduced the antigenicity, thus affording suitable material for grafting procedures. The medical profession, including appellee's surgeon, was therefore fully aware of the fact that the process developed by Squibb did not completely remove all of the antigens from the beef bone sold by it and that the product would contain an antigen residual which the process could not and did not extract. The medical profession practicing the specialty of orthopedics well knew that antigens in unprocessed beef or other animal bone, when implanted in a human being, set up a rejection process which invariably resulted in failure of the grafting material to produce a successful gift. It was generally recognized that the antigen residual remaining in Boplant after the process of sterilization had been completed posed the possibility that an operation performed with it as the grafting material might therefore result in a failure. Whether success was attained depended upon the physiological ability of the individual patient's body to overcome the antigenicity in the bone and accept it into the system. The possibility of failure, however, is not sufficient to establish that the product was defective or unfit for its intended use.
Appellee further complains that Squibb falsely represented its product, Boplant, to be comparable to autogenous bone, which representation was a motivating factor that influenced Dr. Davis in deciding to use it in his operation. The claim of falsity in this representation is belied by the evidence, as supported by Dr. Davis' own testimony, that the failure rate of orthopedic procedures in using autogenous bone ranged from 10 to 15%. This is the same percentage of failure reported to Squibb in thousands of cases in which Boplant was used as the grafting material.
Appellee sought to support his cause of action with the testimony of several expert witnesses. Dr. Davis, appellee's surgeon, as well as another medical expert who made a clinical examination of the Boplant material removed from Stickney's spine three years after the initial operation was performed, testified that the fusion in Stickney failed because the grafting material contained protein antigens which Stickney's body rejected and refused to accept. It was because of this medical finding that these two witnesses testified that in their professional opinion Boplant as a processed implant material for orthopedic procedures was inherently defective and adulterated to the extent that it would not serve the purpose intended. Furthermore, Dr. Davis fortified his opinion by the revelation that he had experienced a 60% failure rate on 63 patients in whom Boplant was utilized as an implant bone grafting material. This is the same Dr. Davis who previously testified for the plaintiff in the Jordan case, supra,[7] in which he then stated that his rate of failure with Boplant was 90%. *907 Although Dr. Davis' rate of failure by the use of Squibb's product was far above the average 15% rate experienced by other orthopedic surgeons throughout the country, the reason for such excessive failure rate does not appear from the record. Another medical expert testified on behalf of appellee that under an institutional grant he conducted laboratory experiments on 21 dogs using Boplant cancellous slabs (not cortical strips which were used in appellee-Stickney's case) as bone grafting implant material. He testified that the results of his experiments were so highly unsatisfactory that in his professional opinion Boplant was ineffective as a bone grafting material and the results from its use were no better than if no grafting material had been used at all.
Appellee's expert testimony does not in any manner establish that the antigenicity properties in the Boplant used in Stickney's operation were present in any higher degree than in the same product used by other orthopedic surgeons throughout the country in the 11,000 cases in which it was used or in the approximately 3,600 reported cases in which its use had resulted in an 85 to 90% success rate and only a 10 to 15% rate of failure. For these experts to conclude and urge as their professional opinion that Boplant was inherently defective, merely because it possessed antigen residuals which Stickney's body and the bodies of some other patients rejected, constitutes an opinion based upon an erroneous assumption of fact. The fact that the product contained antigen residuals which occasionally cause the graft to fail forms no proper basis for the conclusion that the product is inherently defective in view of the high percentage of success realized in thousands of other similar operations. It has been uniformly held that the testimony of an expert witness which is premised solely upon a demonstrably false assumption of fact or patent misconception of law is not a sufficiently competent foundation to sustain a jury verdict.[8]
With regard to the issue of fraud, our review of the record reveals no evidence which can reasonably support a finding that Squibb willfully ignored, concealed, or suppressed any dissenting or adverse medical reports concerning the causes or extent of the failures experienced by some surgeons in the use of Boplant as a grafting material. On the contrary, reports of such failures as were received by Squibb were promptly transmitted to the FDA and were the subject of widespread publicity within the profession through medical journals, published manuscripts and summaries, and papers read at medical seminars. Likewise, the record is devoid of any evidence establishing that Squibb's promotional advertising or instructive literature regarding its product, Boplant, was knowingly false or fraudulently made. The testimony of appellee's expert witnesses that all literature, information, and instructions published by Squibb were false was based upon their unsupported conclusion that the product produced by Squibb was inherently defective and unfit for its intended use. Such testimony is therefore wholly incompetent and has no probative value.
Squibb's failure to promptly give notice to the FDA and the medical profession of its decision to discontinue the production of Boplant in July, 1966, did not as a matter of law constitute fraud or amount to a breach of duty owed by Squibb to the prospective users of its product as contended by appellee. No law nor regulation of the FDA rquired such notice, and the high percentage of successful results theretofore *908 attained in the reported surgical procedures employing Boplant did not require or indicate the necessity for giving such notice. Nor did the situation then existing give rise to a duty by Squibb to recall its product from the market or warn against its further use. Appellee's contention, that Squibb's failure to give notice of its decision to discontinue production of Boplant and recall its product from the market constitutes fraud per se, must therefore be rejected.
Lastly, we come to the issue of punitive damages. Here appellee contends that Squibb acted with malice, moral turpitude, wantonness, willfulness, outrageous aggravation, or with reckless indifference to the rights of others[9] by the manner in which it dealt with its product, Boplant, and in permitting it to be used in his operation. Although we have carefully considered the actions by Squibb to which appellee points in support of his claim for punitive damages, we are of the view that such acts are not of such nature as amount to gross negligence as a matter of law under the generally accepted meaning of that term. Having reached the conclusion that appellee failed to establish by any competent proof that Squibb was guilty of a breach of implied or express warranty, negligence or fraud, we hold that the trial court erred in denying appellant's motion for a directed verdict made at the conclusion of the evidence. Having so concluded, it is not necessary to pursue our consideration of the issue of punitive damages. For the foregoing reasons, the judgment appealed herein is reversed and the cause remanded with directions that judgment be entered for appellant.
JOHNSON, J., concurs.
SPECTOR, C.J., specially concurs.
SPECTOR, Chief Judge (specially concurring):
I concur with the very able opinion written for the court by Judge Wigginton. However, having dissented in Squibb v. Jordan, supra, I feel obliged to observe that in Jordan, it seemed to me that the thrust of the plaintiff's case was the deleterious character of the bone implant material actually used in that operation. Upon reviewing the testimony in Jordan, I was of the view that the evidence there supported a jury verdict for the plaintiff based on proof that the implant material actually used was adulterated so as to cause an infection to occur. In the case at bar, however, there is no showing or claim of either infection or specific adulteration. Not even a rise in temperature was reported by Stickney which was referrable to the implantation.
Unlike Jordan, the thrust in plaintiff's case here is a condemnation of the entire concept of using heterogenous bone as implant material because, in effect, it does not work in every case. If we were to accept plaintiff's thesis, then we must also hold that it was wrong to use the implant material in the eighty to eight-five percent of the cases in which the results were favorable.
Carried to other fields of medical research and the discovery of innovative drugs and techniques, the burden of plaintiff's thesis would preclude the use of a newly discovered drug that cures or prevents cancer because it is only eighty or eighty-five, or even fifty, percent effective. No court can be expected to uphold such a proposition.
NOTES
[1] E.R. Squibb & Sons, Inc. v. Jordan (Fla.App. 1971), 254 So.2d 17, 19, 20.
[2] Dickerson, "Products Liability: How Good Does A Product Have To Be?", 42 Ind.L.J. 301, 303 (No. 3, Spring 1967).
[3] Food Fair Stores of Florida, Inc. v. Macurda (Fla. 1957), 93 So.2d 860.
[4] Wagner v. Mars, Inc. (Fla.App. 1964), 166 So.2d 673.
[5] Blanton v. Cudahy Packing Co. (1944), 154 Fla. 872, 19 So.2d 313.
[6] Royal v. Black and Decker Manufacturing Company, (Fla.App. 1968), 205 So.2d 307, 309, 310.
[7] Supra note 1.
[8] Limmiatis v. Canal Authority (Fla.App. 1971), 253 So.2d 912; Anderson v. State Road Department (Fla.App. 1968), 204 So.2d 899; Monsalvatge & Co. of Miami, Inc. v. Ryder Leasing, Inc. (Fla.App. 1963), 151 So.2d 453; Le Fevre v. Bear (Fla.App. 1959), 113 So.2d 390; Arkin Construction Company v. Simpkins, (Fla. 1957), 99 So.2d 557, 561; Podio v. American Colloid Company (1968), 83 S.D. 528, 162 N.W.2d 385.
[9] 9A Fla.Jur. 361, Damages, § 117; Richards Company v. Harrison (Fla.App. 1972), 262 So.2d 258.