345 So.2d 747 (1977)
John E. SCHWAB and St. Paul Fire and Marine Insurance Company, a Foreign Corporation, Appellants,
v.
Leonard J. TOLLEY et al., Appellees.
No. 75-1398.
District Court of Appeal of Florida, Fourth District.
April 1, 1977.
Rehearing Denied May 16, 1977.
*748 Edna L. Caruso, of Howell, Kirby, Montgomery, D'Aiuto and Dean, West Palm Beach, for appellants.
Phillips & Babbitt, and Larry Klein, West Palm Beach, for appellees.
COBB, WARREN H., Associate Judge.
This appeal emanates from a medical malpractice action brought against the appellant, Dr. Schwab, a neurosurgeon, and his insurance carrier. Said appellants hereinafter will be referred to as the defendants, their status at trial.
The facts show that the primary plaintiff below, Dr. Tolley, a 54 year old dentist, was *749 seriously injured in an automobile collision on December 24, 1972. He was treated in the hospital by Dr. Schwab, who diagnosed a swollen cord and spondylosis in the cervical area.
After various tests and discussion with Dr. Tolley and his family, Dr. Schwab performed a cervical decompressive laminectomy on January 12, 1973 to relieve pressure on the spinal cord with the hope of alleviating loss of neurological function. The operation was not successful; subsequently, Dr. Tolley has been essentially without function and quadriplegic.
The action against Dr. Schwab alleged negligence in performing an operation that was contraindicated, in the manner in which he performed the surgery and a myelogram on Dr. Tolley, and in Dr. Schwab's failure to fully inform the plaintiff of the attendant risks.
A verdict was returned by the jury in favor of Dr. Tolley in the amount of $1,325,000 and in favor of Mrs. Tolley, his wife, in the amount of $360,000. They hereinafter will be referred to as the plaintiffs.
The defendants strenuously urge numerous errors at the trial level. The major thrust at oral argument was their contention that "Dr. Tolley failed to carry the burden of proving future loss of earning capacity with reasonable certainty." They argue that it was error for the trial court to allow the introduction of evidence relating to Dr. Tolley's past earnings and to future loss of earning capacity as a dentist since no expert witness could testify, based on reasonable medical certainty, that Dr. Tolley would have been able to return to the practice of dentistry absent the surgery, given the serious paralysis resulting from the collision.
The plaintiffs contend, on the other hand, that the issue is one of apportionment, not the certainty that future damage will occur.
Although there was great conflict in the medical testimony at trial, that which was most favorable to plaintiffs in regard to the above point was given by Drs. Fager, Sussman, and Guttman.
Dr. Fager testified about Dr. Tolley's condition as follows:
"Now how much better he could have been as time went on I think it is hard for anyone to say. Given this particular situation had he not had surgery I think there's every likelihood that he would gave gained some more function, certainly on the left side and probably a good bit more function in the right leg, as one compares his neurological situation with other cases that I've seen over the years ... That (being bedridden or wheelchair bound) is the worst that could have happened. I think that he could have improved enough to be up and around. If I think in terms of patients that I've seen like him, I don't know that he ever would have returned to dentistry."
The question was asked of Dr. Fager by defense counsel:
"Q. Doctor, it's not possible to tell what Dr. Tolley's actual progress would have been had this operation not been performed, is it?
"A. It's not possible to tell how he would have progressed from that point on. I think that's speculative."
The above answer forecloses any right of the trial court or this Court on appeal to find, as a matter of law, that Dr. Tolley could not have returned to dentistry absent the surgery. It presented a factual determination for the jury as to whether or not apportionment was possible.
Dr. Fager later testified:
"If I had to say, based upon my experience with similar cases, I'd say that he'd get around with a cane ... dragging one leg."
Dr. Sussman testified:
"I believe he would have walked (given proper medical care and not given the care that he was). I don't have any doubt about that ... Now, I have never seen a case that stopped (improvement) at two weeks permanently. He had to improve more than that and chances are he would have made major further recovery because when you start getting the toes back, you, *750 as a clinical guide we always know that other muscles are going to come back . . So, I feel it is certain, in some fashion he would, at the worst, have walked. I would have expected much more than that. I would expect he would walk very well and I would doubt that he would, that he would need mechanical devices finally to walk ...
"I believe that (the ability of bladder and bowels) would come back.
"I can't say that (he would have returned to dentistry). I believe that he would have gotten, since he had such excellent use of his left hand, I believe that that use of that hand would have been assured him. Of course, he was a right-handed man. Now, on the right side, at the time he became paralyzed, all he had was his thumb. But, he, the chart does indicate that he had position sense in that hand. Now, whether this dentist would retrain himself so he could use a good left hand or a hand that might be just a thumb, you wouldn't want to speculate. But, now, if that hand did improve further and he just got the index finger back  and I think there is a fair chance of that  I wouldn't know why he might not attempt to go back to dentistry. But, that is, that remains a question."
Dr. Guttman testified:
"... I have no doubt that if that improvement had not been arrested by that operation, that that man (Dr. Tolley) could have walked and used his left hand at least completely, and also partly his right arm."
In response to a query as to Dr. Tolley's progress in the absence of the surgery, Dr. Guttman said:
"This is not speculation at all. Having regard to the continuous improvement he showed before the operation it can be assumed with a great degree of certainty that that man would have improved to such an extent that he would have been able to walk and use his left upper and lower extremity fully, and at least to a great extent also the right. Whether he would have got a complete recovery of the finger muscles on the right, that I could not say ... (W)hether he would have been able to take up his job as a dental surgeon, I would not know, but there is at least a possibility."
It is the position of the defendant that, since prospective damage must be proved with reasonable certainty, as set forth in Grainger v. Fuller, 72 Fla. 57, 72 So. 462 (1916), and the plaintiffs presented no testimony based on reasonable certainty that Dr. Tolley would have been able to return to dentistry absent the surgery, this Court should grant a new trial.
This argument is misleading. It totally disregards the fact that here we are not talking about the certainty that future damage will occur (which is uncontroverted) but its causation.
It has long been the rule in Florida that causation does not have to be proved with reasonable medical certainty or probability. Jacksonville Electric Co. v. Cubbage, 58 Fla. 287, 51 So. 139 (1910); Southern States Power Co. v. Clark, 118 Fla. 521, 159 So. 881 (1935); Eli Witt Cigar & Tobacco v. Matatics, 55 So.2d 549 (Fla. 1951); and Nationwide Mutual Ins. Co. v. Griffin, 222 So.2d 754 (Fla. 1st DCA 1969). Grainger, relied on by defendants, did not concern two traumas and the difficulties of distinguishing their causal effects. It dealt with the wording of a jury instruction to limit recovery for future pain to that pain reasonably certain to occur.
It is an absolute certainty in the instant case that, as a result of either the automobile collision or the surgery or both, Dr. Tolley is a permanent quadriplegic who can never practice dentistry again. No one quarrels with this.
There was testimony at trial, as shown above, that apportionment of the causation of his ultimate injury between the two traumas (the collision and the surgery) was speculative, even impossible. There was ample testimony from which the jury properly could conclude that there was aggravation by the surgery of an existing physical condition caused by the collision, and that they could not determine what portion of Dr. Tolley's complete debility at time of *751 trial resulted from the aggravation and could not say whether that ultimate condition (quadriplegia) would have existed apart from the aggravating injury. Therefore, Dr. Schwab can be held liable for the entire condition. This is exactly the situation contemplated by Florida Standard Jury Instruction 6.2(b) on causation.
The defendants' argument on appeal would be tenable only if the evidence, construed most favorably for the plaintiffs, established a negative: that Dr. Tolley could not have practiced dentistry again as a result of the collision irrespective of the surgery.
The evidence favorable to plaintiff in this regard, as shown by the testimony of Drs. Fager, Sussman, and Guttman, did not establish that negative as a matter of law. Thus the factual dispute was properly submitted to the jury.
Although this rule seems harsh, it is predicated on a sound principle: the prevention of a subsequent wrongdoer from escaping responsibility where his conduct contributed to the creation of the situation in which the problems of apportionment arose. Washewich v. LeFave, 248 So.2d 670 at 673 (Fla. 4th DCA 1971).
The cases cited by defendants  Fuller, supra; Baggett v. Davis, 169 So. 372 (Fla. 1936); and Stores v. Hussey, 100 So.2d 649 (Fla. 1st DCA 1958  deal with the necessity of showing that future damage will occur with reasonable certainty. They do not deal with the apportionment between an original condition and its aggravation where the damage is certain  which is the case before us.
The rule was set forth by this Court in Washewich v. LeFave, supra:
"... where the evidence reveals two successive accidents, and the defendant is only responsible for the second accident, the burden is on the plaintiff to prove to the extent reasonably possible what injuries were proximately caused by each of the two accidents. The jury should be instructed to make an apportionment of the damages as between the two accidents insofar as it may be reasonably possible to do so, but if an apportionment is impossible, the jury may be authorized to charge the defendant with all damages flowing from the entire injury." See also, Wise v. Carter 119 So.2d 40 (Fla. 1st DCA 1960).
The case of University Community Hospital v. Martin, 328 So.2d 858 (Fla. 2nd DCA 1976) is relied upon by defendants. In that case the appellate court found that, although the issue of apportionment was properly submitted to the jury, "the jury erred because we believe from a study of the evidence that it was patent that the aggravation of Martin's condition caused by such injuries sustained at the Hospital could be distinguished from the condition which resulted from his original injuries."
In Martin the Court said: "No medical evidence demonstrated any possibility that Martin would recover from the problems inflicted by the original gunshot wound." (emphasis added).
Martin, therefore, is distinguished from the present case where there was testimony received without objection that Dr. Tolley possibly could have returned to dentistry absent the second trauma.
The Martin opinion expressly recognizes the rule set forth in Standard Jury Instruction 6.2(b) and Washewich, but held it inapplicable because "all the evidence indicated Martin would remain a paraplegic for the rest of his life regardless of the fall" (the second trauma in that case).
Thus, it was held as a matter of law that additional medical bills and loss of earning capacity attributable to paraplegia were not attributable to the fall. Consequently, the appellate court held that a verdict of $350,000 shocked its conscience since the injury was limited to some undefined loss of sensation to a preexisting paraplegic. The case was remanded for a remittitur or new trial at the option of the trial judge.
Clearly that case could not have had the same result on appeal if there had been medical evidence at trial that possibly Martin would have recovered from the gunshot wound so that he could have resumed his *752 prior occupation except for the fall in the hospital. Then, the jury could have determined that apportionment could not be made due to the fault of the tortfeasor causing the second injury, who then would be liable for the entire condition.
Two other cases relied upon by defendants are equally distinguishable, even supportive of plaintiffs' position.
In E.R. Squibb, Inc. v. Jordan, 254 So.2d 17 (Fla. 1st DCA 1971) it was held to be error for the trial court to instruct the jury on apportionment when the plaintiff's witness, the treating physician, allocated fixed mathematical percentages to the original and to the subsequent injury  15% and 5% respectively. "There was no other evidence which tended to indicate that the use of `Bo-plant' (the second injury) was responsible for more than 5 percent of Mrs. Jordan's disability. There being no evidence from which the jury could find an aggravation of the preexisting condition in excess of the 5 percent as testified by Dr. Davis, it was error to submit this issue to the jury and instruct them that they could make allowance in the verdict for the entire condition." See E.R. Squibb, Inc., supra, at page 20.
In the instant case, there was abundant evidence that the extent of the aggravation was extensive and indefinite. See testimony of Drs. Fager, Sussman, and Guttman, quoted above.
The recent case of Security Mutual Casualty Company v. Bleemer, 327 So.2d 885 (Fla. 3d DCA 1976), cited by counsel for defendants, is totally irrelevant to the issue before us. In that case the plaintiff was injured in two automobile accidents several months apart. She contended at joint trial of the cases that the damages could not be apportioned. During trial she settled with the defendants involved in the first collision for $7,000. The trial continued against the defendants in collision number two, and at the end the trial court, without objection, gave the apportionment instruction. But the jury was not instructed to specify whether their verdict was for all or apportioned damages. The verdict was $10,000. The defendant wanted a $7,000 set-off  which they would be entitled to if the verdict was for full, rather than apportioned, damages. There was no way to determine which approach the jury had used in arriving at the $10,000 since their verdict form did not provide this information. Faced with this dilemma, the appellate court found fundamental error in the trial court's not obtaining this information by interrogatory verdict from the jury, so that the propriety of the set-off could be properly determined.
In other words, the trial court failed to submit an essential question to the jury without which there was inadequate information to compute the judgment. Therefore, the final judgment was affirmed as to liability and reversed for new trial as to damages.
The Bleemer case is relevant only in cases involving the computation of a set-off.
On this appeal no issue of set-off has been raised. For all we know, there has been no settlement or litigation involving the collision.
The defendants also argue that the trial court was in error in instructing the jury that if they could not determine what portion of Dr. Tolley's condition resulted from aggravation or if it could not be said that the condition would have existed apart from the injury, then they should make allowance for the entire condition in their verdict.
In addition to the discussion under the first point, we observe in regard to this point that there is nothing before this Court to show whether or not the jury did, in fact, apportion damages.
There was no inherent reason here, as in Security Mutual Casualty Company v. Bleemer, supra, for the trial court to require the jury to designate whether or not its award was based on apportionment or total damages. No set-off was involved here.
The defendants apparently did not request an interrogatory verdict in this regard.
*753 Therefore, the defendants have not shown that the jury did allocate all of Tolley's damages to them. That burden is on them on appeal.
The defendants also challenge the sufficiency of the following instruction given by the trial court:
"You are instructed that the duty of a physician in connection with the diagnosis and treatment of a patient is that the physician must use the ordinary skills and means and methods that are recognized as necessary and which are customarily followed in the particular type of case according to the standards of those who are qualified by training and experience to perform similar services in the community or in a similar community and the failure of a physician to do so would constitute negligence. However, physicians are allowed a wide range in the exercise of their judgment and discretion. They fulfill their obligation if they use methods approved by others of their profession who are reasonably skilled.
A doctor who practices a specialty is bound to exercise the special degree of care, skill and knowledge possessed by members of his profession who specialize in the treatment of similar conditions in similar localities, having a regard for the present state of medical and scientific knowledge at the time of the treatment."
This instruction is substantially the same as that now recommended by the Florida Supreme Court in Florida Standard Jury Instructions (see Instruction 4.2, pages 1 and 2). The instruction sought by defendant in regard to "respectable minority" or "two schools of thought", supported by California case law, was adequately covered in the trial court's instruction.
The case of Baldor v. Rogers, 81 So.2d 658 (Fla. 1954) does not support the defendants' requested instruction in any way. In Baldor the Florida Supreme Court concluded that the trial jury was justified in finding the defendant doctor negligent. The doctor kept treating a lip cancer with injections (which represented one of many schools of thought at that time) and, despite continued spread of the cancer and the ineffectiveness of the treatment, known as the Koch method, he failed to inform the patient, at the earliest possible time, that the conservative treatment was not working and the only prospect for recovery lay with other more drastic treatments. This case did not deal with the propriety vel non of an instruction such as that requested by defendants in the instant case.
The defendants' contention that the trial court should have given their "honest error in judgment" instruction is contrary to the committee recommendation in its comments on Standard Jury Instruction 4.2(a). The committee states that the charge is "confusing, difficult of application and argumentative."
The defendants' other related charges which were rejected are analogous to a charge that "negligence may not be inferred from the mere happening of an accident alone", which the committee recommends against as argumentative and negative. See comment No. 1 on Standard Instruction 4.1, and comment No. 2 in regard to "unavoidable accidents."
The defendants further contend that the testimony of Dr. Guttman was inadmissible because he was not familiar with the standard of care in Palm Beach County or similar communities and did not adhere to the correct "standard of care" definition in rendering expert opinion.
It is clear from reading the testimony of Dr. Guttman that he professes a familiarity with the standard of care for neurosurgery in the United States; there is no basic difference in that standard in Palm Beach County and elsewhere in the United States. This is a matter of common sense as well as case precedent.
It is true that Guttman defined the standard of care at one point in his testimony as being the viewpoint of "a leading neurosurgeon." Dr. Schwab, of course, cannot be held to more than the skill and diligence of the average practitioner in the same or a similar community. Couch v. Hutchinson, 135 So.2d 18 (Fla. 2d DCA *754 1961). Several times in his testimony Guttman referred to "leading and responsible neurosurgeons." When Guttman was asked to talk about average, as opposed to leading, neurosurgeons, he seemingly could not comprehend the word average as applied to neurosurgery. To him the opposite of a leading and responsible neurosurgeon was one "with no experience or very little experience" and not familiar with the "modern concept of treatment." The latter is "certainly under standard," according to Guttman.
In other words, to Guttman there are "leading and responsible neurosurgeons" and those under standard through lack of experience. He conceived of no other categories. Guttman's standard, although couched in pompous terms, is nothing more than the ordinary standard of care since his alternative to a "leading, responsible neurosurgeon" is an incompetent one. His testimony, taken in its entirety, clearly reveals this.
The defendants objected to the trial court striking a portion of the Guttman deposition testimony wherein he said that, as far as he knew, he did not believe that one Dr. Becker, a defense witness acknowledged as having a good reputation, would advocate early surgical intervention in the instant case. The defendants argued that this should have been admitted to impeach Guttman.
What Guttman thought Becker would think is irrelevant and inadmissible. A witness may not be impeached by proof of statements as to immaterial matters. Whaley v. State, 157 Fla. 593, 26 So.2d 656.
The proper method for impeaching Guttman's opinion was by the introduction of contrary opinion based on the same facts, not to elicit from one expert what he thinks of another. Ecker v. National Roofing of Miami, Inc., 201 So.2d 586 (Fla. 3d DCA 1967).
Moreover, the opinion stated by Guttman as to early surgical intervention was not actually controverted by Becker or anyone else. Guttman's opinion, as set forth in the record, was that, given an incomplete lesion of the spinal cord, "there is no immediate or even early urgency to operate in the time when the patient has improved in his neurological condition." (emphasis added).
Nothing in Dr. Becker's testimony challenges this medical opinion. In fact, all of defendants' expert witnesses agreed with this opinion. The difference between Guttman and Becker in this case was the factual determination as to Tolley's improvement between the collision and surgery. Guttman found significant and continuing improvement; Becker did not. The factual dispute between them was fully presented to the jury.
The jury heard the opinions of each Guttman and Becker in this case, and had ample opportunity to weigh one against the other without the witnesses being asked to usurp the jury function by evaluating each other.
The defendants urge that the jury instruction on informed consent was improper in that it stated that disclosure was to be made to Leonard J. Tolley, whereas, under the evidence in this case, the instruction should have apprised the jury that disclosure also could have been made to the family of Dr. Tolley.
At the trial the defendants did not ask for the instruction they now request and, in fact, expressly told the trial court that the charge on informed consent should be given.
The record does not reveal any reservation of objections as now asserted by defendants on appeal. There was certainly no approval by the trial court of any agreement that any and all objections were reserved for appeal whether or not they were brought to the attention of the trial court, even by implication or indirection. It would be unreasonable to expect this of any trial court, and turn instruction conferences into games of ambush. The Court stated that it was understood that each side would have an objection to charges given which were not requested by that party or failure to give requested charges. Here, both sides agreed to an informed consent charge and *755 worked on the phraseology of it. No objection as to the giving of such a charge was stated. The informed consent charge was as much that of the defendants as of the plaintiffs. Indeed, defense counsel at trial was the primary contributor to the phraseology of the instruction that the defendants now assail on appeal. If the charge was erroneous, the error was induced, at least in part, by counsel for the defendants.
In the recent case of Klepper v. J.C. Penney Co., Inc., Fla.App. 4th, 340 So.2d 1170, 1976, the Court stated:
"... (T)rial counsel has a special duty to his client and to the trial judge to read the instructions as the judge recites them and to aid in the prevention of the kind of error which occurred in the case sub judice by objection to or pointing out the error."
That same principle is applicable to the preparation, as well as to the reading, of instructions.
The remaining points on appeal are without merit.
Accordingly, the judgment of the lower court is AFFIRMED.
ALDERMAN, J., and SMITH, ROBERT, Associate Judge, concur.