JiDOUCET, Chief Judge.
This is an appeal from a jury verdict finding that Dr. James Lipstate did not commit malpractice in his treatment of Mrs. Janell McCoy.
In late 1984, Mrs. McCoy was diagnosed as having rheumatoid arthritis. Rheumatoid arthritis is disease of the joint. The synovi-um or lining of the joint becomes inflamed and can eat into the bone. The inflammation produces an excess of fluid. The fluid so produced is abnormal in that it does not have lubricating quality of normal synovial fluid found around the joints. Symptoms of rheumatoid arthritis include joint pain, swelling *765 and deformity of the joints. Dr. James Cala-mia treated Mrs. McCoy from her diagnosis until March 1, 1990, when he moved his practice. On her initial visit her blood pressure was 106/70. Dr. Calamia initially prescribed Naprosyn, a non-steroidal anti-inflammatory drug and Ridaura, a drug containing gold that helps relieve the symptoms of rheumatoid arthritis by unknown means. She continued to take Naprosyn until May 1990. In July 1989, the Ridaura was discontinued because it was losing effect. Metho-trexate was |2prescribed in its place. She began taking 7.5 mg. of methotrexate per week, orally. Between October 1984 and July 1989 Mrs. McCoy’s blood pressure varied from a low of 102/64 to a high of 120/80. In September 1989 her blood pressure reading went up to 170/90. In December 1989, Dr. Lipstate saw Mrs. McCoy in Dr. Cala-mia’s place. She was having a severe flare up of her arthritis with symptoms of carpal tunnel syndrome caused by the swelling. Her blood pressure was 140/84. Dr. Lipstate increased the methotrexate to 10 mg. per week. He prescribed folic acid. Folic acid tends to decrease such side effects of metho-trexate as nausea, hair loss and mouth lesions. He also gave her an injection of Me-thylprednisolone, a steroid that rapidly reduces swelling. On March 1,1990, Dr. Lips-tate took over the treatment of Mrs. McCoy. On that date he increased the dosage of the methotrexate to 15 mg. per week. Her blood pressure was 182/90. In May 1990, Dr. Lips-tate discontinued the Naprosyn and began giving Mrs. McCoy Voltaren, another non-steroidal anti-inflammatory drug. Her blood pressure was 152/74 on that visit. On August 15, 1990, Dr. Lipstate injected Mrs. McCoy with 15 mg. of methotrexate. Her blood pressure was 136/82.
On August 18, 1990, Mrs. McCoy suffered a stroke. As a result Mrs. McCoy and her husband made medical malpractice claims against Drs. Calamia and Lipstate alleging that their negligence in treating her was the cause of her stroke. The claim was first submitted to a medical review board. The medical review board found that:
“1.
The evidence does not support the conclusion that the defendant, JAMES LIPS-TATE, M.D., failed to meet the applicable standard of care as charged in the complaint.
2.
The conduct complained of was not a factor of any resultant damages to plaintiff.”
Dr. Calamia was dismissed from the suit prior to trial. Before trial the plaintiffs were ordered to comply with Fifteenth Judicial District local rule 17 which required them to deposit with the court reporter the cost of taking the trial testimony.
After trial, the jury rendered a verdict in which it found that Dr. Lipstate did not lack that degree of knowledge and skill required by national standards of practice for the 13medical specialty of rheumatology. The jury further found that Dr. Lipstate’s conduct did not fall below the standard of care required of him as a rheumatologist under the circumstances. The trial judge assessed costs pursuant to a motion filed by the defendant. The plaintiffs filed a post-trial motion for contempt against Dr. Hector Mena for failure to attend the trial. The plaintiffs then filed a motion to recuse the trial judge. The trial judge denied the motion for contempt after refusing to deal with the motion to recuse because no order was attached to it. The plaintiffs appeal the verdict, and the refusal of trial judge to assign the motion for recusal to another judge before hearing the motion for contempt and the order requiring them to comply with local rule 17.
The plaintiffs allege that the jury verdict was tainted by legal errors made by the trial judge to such an extent that the verdict is invalid. They argue that, as a result, they are entitled to a de novo review by this court. COMMENTS ON THE EVIDENCE
The plaintiffs first allege that the trial judge erred by commenting on the evidence. The alleged comment occurred during the cross-examination of the defendant, Dr. Lips-tate, by counsel for plaintiff. Counsel was questioning the defendant about the drug *766 Naprosyn. Counsel for the defendant objected to the relevancy of the line of questioning. During the argument on the objection the trial judge made the following exchange took place:
THE COURT: Well, the problem is you’ve carried this discussion on Naprosyn a little too far, and I think we need to move on. Okay?
MR. SIMON: Well, we’re talking about the generator of the system, Your Honor.
THE COURT: I understand, Mr. Simon. What you’re doing is giving us all an anatomy class that I’m not sure anybody is following now, and I think that—
MR. SIMON: Well, I object to that. I object to Your Honor’s comment. This is for the jury to determine, if Your Honor please. As long as I’m engaged in relevant examination, it’s for the jury to determine what the impact of that testimony is.
THE COURT: I agree one hundred percent, Mr. Simon,—
MR. SIMON: Yes, sir.
UTHE COURT: —but the problem is the doctor’s giving you answers that you’re not satisfied with, and you’re now arguing with him.
MR. SIMON: I’m not arguing.
THE COURT: And I think that’s what we’re doing. Okay....
The plaintiffs argue that the trial judge’s “characterization of plaintiffs’ counsel’s examination of the defendant as a boring anatomy class no one wants to listen to was both improper and highly prejudicial” and requires reversal of the jury verdict.
La.C.C.P. art. 1791 states that:
“The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.”
In the recent case of Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 312, the court discussed this as follows:
“Generally, a trial judge is afforded discretion in conducting a trial, even a jury trial. However, that discretion is circumscribed by considerations of justice and fairness and by La.C.C.P. art. 1791, which prohibits a trial judge from making any kind of comments on the evidence. The trial judge is generally prohibited from engaging in a pattern of judicial conduct which demonstrates prejudice to one party and/or partiality to the other party.”
This court in Calhoun v. Federated Rural Elec. Ins. Co., 571 So.2d 672, 677 (La.App. 3 Cir.1990), writ denied, 577 So.2d 14 (La.1991) also discussed this subject:
“The reasons given by a trial judge in a jury’s presence for his rulings on objections, for admitting or excluding evidence, or explaining the purpose for which evidence is offered or admitted, are not objectionable as comments or expressions of an opinion on the evidence provided that they are not unfair or prejudicial to the party complaining. Oh v. Allstate Insurance Co., 428 So.2d 1078 (La.App. 1st Cir.1983) Additionally, the trial judge has the responsibility to avoid confusing the jury and the right to use whatever semantics may be appropriate for this purpose. Kolmaister v. Connecticut General Life Insurance Co., 370 So.2d 630 (La.App. 4th Cir.), writ denied, 373 So.2d 531 (La.1979).”
After reviewing the judge’s remarks about which plaintiff complains, we cannot say that they comprise the type of comment forbidden by La.C.C.P. art. 1791. Nor can we say that they are unfair or prejudicial to the plaintiff. Had the trial judge, in fact, characterized Isthe examination as boring or said that no one wanted to listen, the outcome on this issue might differ. However, to interpret the judge’s remarks in this way is to mischarac-terize them. These remarks were made in the proper exercise of the trial judge’s power to conduct trial in an orderly and expeditious manner. La.C.C.P. art. 1631. We find nothing in the exchange which requires reversal of the jury verdict.
ADMISSION OF OPINION OF MEDICAL REVIEW PANEL AND REASONS
The plaintiffs next argue that the trial court erred in allowing the defendant to in *767 troduce into evidence the opinion of the Medical Review Panel and the written reasons for that opinion. The plaintiffs contend that this error requires that the jury verdict be vacated.
On March 2, 1994, the plaintiffs moved to strike the decision of the medical review panel and that all testimony in support of its ruling or opinion be stricken. The minutes of the court reflect that the motion was denied on March 9, 1994. Writs were taken to this court. This court denied the writs finding no error in the trial court’s ruling. Plaintiffs’ application for writs to the Louisiana Supreme Court were also denied.
On review of this assignment of error, we find that it is simply a rehash of the arguments brought before this court in connection with the original motion to strike. These arguments have been considered and rejected by this court and the Louisiana Supreme Court. After reviewing the record, we find no reason to reconsider it on appeal. RES IPSA LOQUITUR
The plaintiffs next argue that the jury’s verdict should be vacated because of the trial judge’s failure to charge the jury as to the doctrine of res ipsa loquitur.
The First Circuit Court of Appeal, in Orgeron v. Lafourche Parish Hosp. Dist. No. 1, 625 So.2d 739, 740-741 (La.App. 1 Cir.1993), clearly outlined the proper use of the doctrine of res ipsa loquitur.
“In Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 665-66 (La.1989), on rehearing, the court discussed the requisite for the application of the doctrine of res ipsa loquitur:
‘In order to utilize the doctrine of res ipsa loquitur the plaintiff must establish a foundation of facts on which the doctrine may be applied. [ 6The injury must be of the type which does not ordinarily occur in the absence of negligence. In other words, “the event must be such that in light of ordinary experience it gives rise to an inference that someone must have been negligent.” The basis on which this conclusion is drawn is usually knowledge common to the community as a whole, although in cases such as medical malpractice expert testimony may be used to establish this principle. The plaintiff does not have to eliminate all other possible causes or inferences, but must present evidence which indicates at least a probability that the injury would not have occurred without negligence.
... The plaintiff must show not only that an accident occurred or that the accident was caused by the negligence of someone, but also that the circumstances warrant an inference of defendant’s negligence.’ (Citations omitted).
The doctrine does not dispense with the requirement that the plaintiff must prove negligence by a preponderance of the evidence. It simply gives the plaintiff the right to place on the scales, ‘along with proof of the accident and enough of the attending circumstances to invoke ... an inference of negligence’ sufficient to shift the burden of proof. Montgomery v. Opelousas General Hospital, 540 So.2d 312, 319 (La.1989).”
Here there was no evidence that the stroke suffered by Ms. McCoy was the kind of injury that does not occur in the absence of negligence. Accordingly, the trial judge did not abuse its discretion by failing to charge the jury about res ipsa loquitur.
ALTERNATE TREATMENT METHOD JURY CHARGE
The plaintiffs further argue that the trial judge erred in charging the jury that Dr. Lipstate would not be negligent merely because he made a choice of a recognized alternative method to treatment, which, after the fact, proved to cause a complication, if he exercised the required care, skill and judgment in selecting and following the method of his choice. Plaintiffs argue that this charge is only applicable to cases where the physician incorrectly diagnoses the patient’s condition and as a result chooses an incorrect treatment method. This argument is without support in the jurisprudence. The correctness of the charge given by the trial judge is supported by the cases of Reid v. North Caddo Memorial Hosp., 528 So.2d 653 (La. App. 2 Cir.1988) and Frasier v. Department *768 of Health and Human Resources, 500 So.2d 858 (La.App. 1 Cir.1986). As a result, we find that the trial judge correctly charged the jury on this point.
JtDIRECT ADDRESS OF DEFENDANT TO JURY
Plaintiffs next argue that the trial judge erred in failing to grant a mistrial after Dr. Lipstate made the following answer to a question during direct examination:
“Rheumatoid arthritis also is a disease that affects the whole body. It’s not just a disease of the joints. It affects the whole fiber. It changes the whole way a person has to approach their life. Some of these symptoms include fatigue; sometimes severe, overwhelming fatigue.
Have any of you ever had the flu? You know how you feel tired and achy — ”
Counsel for plaintiff objected. He argued then and now that this violates the proscription against counsel asking the jury to put itself in the shoes of a party. We agree that had counsel for defendant addressed the jury with a plea that it put itself in the defendant’s place, this could have been improper under certain circumstances. However, we find it impossible to interpret the defendant’s remark as a plea that the jury put itself in his place. We can imagine no way in which this remark could be seen to influence the jury’s verdict in any way. Accordingly, we find no error in the trial court’s denial of plaintiffs motion for mistrial.
Accordingly, we find no merit in the plaintiffs’ contention that the jury verdict was tainted by legal errors made by the trial judge to such an extent that the verdict is invalid, thereby entitling them to a de novo review by this court.
LIABILITY
The plaintiffs do not argue that the verdict is incorrect given the evidence before the jury. However, the court in Warthen v. Warthen, 517 So.2d 452, 454 (La.App. 1 Cir. 1987) stated that:
“Whether a particular issue is specifically set out as an error on appeal does not limit this court’s power of review. An assignment of error is not necessary in any civil appeal. LSA-C.C.P. art. 2129.
The court of appeal has a constitutional duty to review law and facts particular to each case. LSA-Const. Art. 5, Sec. 10. Furthermore, the appellate court has authority to render any judgment which is just, legal and proper upon the record on appeal, regardless of whether a particular legal point or theory is advanced. LSA-C.C.P. art. 2164.” (Footnotes omitted.)
Therefore, we will review the record for manifest error.
| ¡/‘Revised Statute 9:2794 sets forth the burden of proof imposed upon the plaintiff in establishing his malpractice claim. The plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
See La.Rev.Stat.Ann. § 9:2794(A) (West 1991). Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.”
*769 Pfiffner v. Correa, 94-0924, at p. 7 & 8 (La. 10/17/94), 643 So.2d 1228, 1283.
In reviewing the jury’s finding as to whether the plaintiff has carried this burden, the appellate court is not free to substitute its own judgment for that of jury. Rather, our standard of review is limited to determining whether there was evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a factual basis for the fact finder’s conclusion. Riley v. Winn-Dixie Louisiana Inc., 489 So.2d 931, 935 (La.App. 5th Cir.), writ denied, 494 So.2d 329 (La.1986).
Dr. Lipstate testified concerning Mrs. McCoy’s treatment. He reviewed the medication given Mrs. McCoy. He stated that he treated Mrs. McCoy with both 19methotrexate and Voltaren because he has found that the combination is more effective against the symptoms of rheumatoid arthritis than either alone. According to Dr. Lipstate methotrexate has a half-life (the time needed for half the drug to leave the body) of 3-10 hours. He noted that each patient is monitored for drug reactions by taking a blood count on a monthly basis and a complete blood chemistry every four months. Mrs. McCoy’s test results were normal, according to Dr. Lipstate. There was nothing to indicate kidney dysfunction.
He stated that the borderline between normal and high blood pressure is at about 140/90. Systolic pressures between 140 and 160 are considered borderline. Diastolic pressures between 90 and 105 are consistent with mild hypertension; between 105 and 115 mild hypertension; and over 115 severe hypertension. He does not feel that every elevation in blood pressure requires treatment. Before he treats a patient for hypertension he would want to see high reading on three consecutive visits. He opined that to treat a patient for hypertension based on a single high reading would be substandard care. He noted that many people have high blood pressure reading when at the doctor because of nervousness. The reading of 182/98 obtained on March 1, 1989 did not overly concern him due to the circumstances of the visit. Mrs. McCoy was having a bad flare-up of arthritis. Her hands, wrists and shoulders were inflamed. Further, she was upset because her doctor of six years was gone. He felt that these factors could have caused a temporary elevation in blood pressure.
Three rheumatologists testified as to the standard of care for rheumatologists: Dr. Alben Goldstein, Dr. Robert J. Quinet and Dr. Reginald Sanders. It is undisputed that Dr. Lipstate had the requisite degree of skill and knowledge for a rheumatologist. Therefore, we must determine whether the evidence indicates that he breached that standard.
Dr. Goldstein reviewed Mrs. McCoy’s records and testified as an expert for the plaintiff. He stated that he felt that Dr. Lipstate had deviated from the standard of care in several respects. He stated that non-steroidal anti-inflammatory drugs (NSAIDs) such as Naprosyn and Voltaren can cause problems with the kidney’s excretion of methotre-xate and the blood level of methotrexate will go up. He stated that methotrexate can cause sores in the mouth, stomachache, liver function problems, kidney problems, blood hoproblems and hair loss. He stated that Mrs. McCoy had hypertension as it is defined in this country. He stated that 170/90 is a high blood pressure reading on an absolute scale. He opined that after obtaining this high reading, Mrs. McCoy’s doctors should have had her come back to the office within two weeks afterwards in order to monitor her blood pressure. He further opined that it was more probable than not that the cause of the stroke was the medication and the failure to address the rising blood pressure. His theory was that the long-term use of the NSAIDs alone and in combination with me-thotrexate damaged Mrs. McCoy’s kidneys; that the kidney damage caused a rise in blood pressure and that the high blood pressure caused the stroke. However, he admitted that the record contained nothing which would prove that Mrs. McCoy had kidney damage as there was nothing clearly abnormal in her tests. Further, he found nothing in the medical literature which suggested a connection between low dose methotrexate and hypertension. In fact, in his practice, he prescribes 15 mg. doses of methotrexate in combination with Voltaren. He stated that it *770 was the proximity between the injection of methotrexate and the stroke which made him believe that the stroke was caused by metho-trexate, in spite of the fact that her last blood pressure reading before the stroke was “pretty normal.”
Dr. Robert Quinet served on the medical review panel which reviewed Dr. Lipstate’s actions. He reviewed Mrs. McCoy’s record and testified as follows: His opinion was that Dr. Lipstate had not breached the standard of care. 15 mg. of methotrexate per week combined with 150 mg. per day of Voltaren is an appropriate treatment for rheumatoid arthritis. The test results indicate that Mrs. McCoy’s kidney function was normal as of August 15, 1990. He stated that the problems in the use of NSAIDs and methotrexate come with the high doses of methotrexate used in cancer chemotherapy. He said that consensus of opinion among rheumatologists was that methotrexate does not cause high blood pressure and would not cause a stroke. Further, he knew of no data to indicate that methotrexate, either by itself or in combination with NSAIDs, would cause an elevation in blood pressure. While NSAIDs can affect kidney function, rheumatologists test their patients to check this. All Mrs. McCoy’s test results were within normal ranges. He stated that, from week to week, creatinine levels in all people can fluctuate up to 40% within normal range. The appropriate procedure is to keep track of the creatinine level. If it does | unot rise above the normal range one would not change the patient’s treatment. He also stated that as a rheumatologist the elevation in Mrs. McCoy’s blood pressure would have concerned him. He would have rechecked within the next two weeks. However, he stated that some rheumatologists would limit themselves to treating the rheumatoid arthritis and would leave the blood pressure to the patient’s general practitioner or internist. He did not feel that the March 1, 1989 reading of 182/98 was one which would require treatment for hypertension. With Mrs. McCoy’s readings he would have suggested she restrict her salt intake. If she was overweight he would have suggested a diet. If she was not exercising he would have suggested exercise.
Dr. Sanders also served on the medical review panel. He reviewed all the medical records and depositions of the parties, as well as other documents pertaining to the case. He found that Dr. Lipstate’s treatment of Mrs. McCoy did not deviate from the standard of care for a rheumatologist. He did a search of the literature and found no data to indicate a connection between metho-trexate and strokes, even in the high doses used in cancer treatment. He stated that when rheumatoid arthritis patients are compared with the general population, rheumatoid arthritis patients are found to have a higher rate of stroke. Also the mortality rate is higher among rheumatoid arthritis patients than among the general population.
He stated that methotrexate is the premier drug for the treatment of rheumatoid arthritis. Methotrexate in combination with NSAIDs is the almost universal treatment for rheumatoid arthritis, according to Dr. Sanders. He has never seen evidence that methotrexate affects the blood pressure. He would not stop methotrexate in a stroke victim. While the effect of methotrexate on the arthritis symptoms last about a week, Dr. Sanders noted that the drug is completely out of the body within 2 or 3 days. He stated that NSAIDs are frequently used together with methotrexate. He said that they do not cause elevation of blood pressure either alone or in combination with methotre-xate. He has never had a case in which the use of methotrexate with an NSAID caused an elevation in blood pressure or a stroke. He admitted that both methotrexate can cause renal insufficiency in rare cases, and that renal insufficiency can cause an elevation in blood pressure. However, he stated that the literature does not show that this actually happens. h2He further stated that Voltaren can reduce renal blood flow. However, a patient will not necessarily get high blood pressure from this. Further, he stated that Mrs. McCoy’s test results do not indicate renal insufficiency.
He stated that he saw no indication that Mrs. McCoy should have been being treated for hypertension. The elevated blood pressures seen in Mrs. McCoy could be accounted for by the increased pain which caused her to *771 visit the rheumatologist. However, he stated that movement within the normal range of blood pressures is important to note. He would want to make sure that there was a benefit to be gained before treating a person who has a reasonably normal blood pressure. In a case like Mrs. McCoy's he would continue to monitor her blood pressure when she came in for visits. He further opined that a high diastolic pressure is more of a risk than a high systolic because so many things can cause the systolic to vary.
After reviewing the testimony, we conclude that the jury could have reasonably rejected the opinion of Dr. Goldstein and accepted that of Drs. Lipstate, Quinet, and Sanders. In light of the evidence, we find that there was evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnished a factual basis for the its conclusion. The record does not indicate that this determination was manifestly erroneous. Accordingly, this court will not disturb the jury’s verdict
MOTION TO RECUSE
Plaintiffs further argue that the trial judge erred in ruling on their motion for contempt against Dr. Mena for his failure to appear in response to a subpoena and defendant’s motion to set costs without their motion for recusation being first ruled on. The record reflects that the motion to recuse was brought to the trial judge’s attention at the hearing on the other motions. The judge refused to consider it because no order to set it for a hearing had been attached. For purposes of judicial economy we will treat this as a denial of the motion. Initially, we note that a judgment had already been rendered in the rule to assess costs before the motion to recuse was filed. La.C.C.P. art. 154 states that:
“A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recu-sation thereafter, in which event it shall be filed liaimmediately after these facts are discovered, but prior to judgment. If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or a judge ad hoc, as provided in Articles 155 and 156, for a hearing.” (Emphasis added.)
Accordingly, if the motion set forth a valid ground for recusal, it should have been referred to another judge for a hearing.
La.C.C.P. art 151 sets out the grounds for recusal of a judge, as follows:
“A. A judge of any court, trial or appellate, shall be recused when he is a witness in the cause.
B. A judge of any court, trial or appellate, may be recused when he
(1) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter’s employment in the cause;
(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney’s firm), and in this case the employment shall be disclosed to each party in the cause;
(3) Has performed a judicial act in the cause in another court;
(4) Is the spouse of a party, or of an attorney employed in the cause; or is related to a party, or to the spouse of a party, within the fourth degree; or is related to an attorney employed in the cause; or to the spouse of the attorney, within the second degree; or
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties’ attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
C. In any cause in which the state, or a political subdivision thereof, or a religious body or corporation is interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or is a member of the religious body or corporation, is not a ground for recusation.”
*772 To be referred to another judge a motion to recuse must cite one of these grounds. However, this alone is not enough.
“A judge is presumed to be impartial. The party seeking to recuse cannot merely allege lack of impartiality; he must present some factual basis. Bias, prejudice or personal interest must be of a substantial nature and based on more than eonelusion-ary allegations. Pierce v. Charity Hospital, 550 So.2d 211, 213 (La.App. 4th Cir.), writ denied, 551 So.2d 1341 (La.1989).”
Earles v. Ahlstedt, 591 So.2d 741, 746 (La. App. 1 Cir.1991).
Plaintiffs, in their motion to recuse, contend that the trial judge is biased in favor of physicians. In support of this contention they cite the trial judge’s alleged comment that it is the failure of attorneys to make arrangements with medical professionals for their appearance in court that accounts for hostility between the legal and medical professions. They further cite the fact that he assessed the costs of Dr. Sanders deposition as court costs as evidence of this alleged bias. Upon examining these allegations we must conclude that they do not show bias of such a substantial nature as to support a motion to recuse. Accordingly, the motion to recuse was "without merit.
Although the plaintiffs have not assigned error as to the ruling of the trial court concerning the assessment of the costs of Dr. Sanders’ deposition or as to his ruling on the motion for contempt, we will review those rulings.
SANDERS DEPOSITION COSTS
The plaintiffs argue that “La.R.S. 13:3666 requires that the party incurring the pre-litigation costs sought to be recovered as costs must first call the expert to testify at trial, in order to recover those costs from the party cast in judgment.” We disagree. This court has consistently held that deposition costs may be taxed as costs of court. La. R.S. 13:3663 provides that deposition fees shall be considered as costs of court. Further, this court held in Roy v. Gupta, 606 So.2d 940, 946 (La.App. 3 Cir.), writ denied, 609 So.2d 232 (La.1992):
“La.R.S. 13:3666 authorizes the trial court to determine the amount of fees to be paid an expert witness either
(1) from the testimony adduced upon the trial of a cause, the court shall determine the amount thereof and include same or,
(2) by rule to show cause ...
Further authority appears in La.R.S. 9:2794 B, which provides that “the fee of the physician ... called for deposition and/or testimony under this section will be set by the court.” ... Although the court is not bound by the fee arrangement between a litigant and his expert witnesses, it may award the full amount charged if the amount is reasonable in light of the many factors the court considers in fixing expert witness fees. | igMcGee v. Miears, 516 So.2d 1241 (La.App. 2nd Cir.1988) No contradictory rule is required where the court is satisfied from the testimony adduced at the trial.”
Accordingly, the trial court did not err in taxing the fee for Dr. Sanders deposition as a cost of court.
MOTION FOR CONTEMPT
plaintiffs brought a rule to hold Dr. Hector Mena in contempt of court for his failure to appear at trial in response to a subpoena. Dr. Mena does not dispute that he received a subpoena. La.C.C.P. art. 1357 provides that:
“A person who, without reasonable excuse, fails to obey a subpoena may be adjudged in contempt of the court which issued the subpoena. The court may also order a recalcitrant witness to be attached and brought to .court forthwith or on a designated day.”
(Emphasis added.)
In this ease the trial court refused to find Dr. Mena in contempt because plaintiffs never called him as a witness or attempted to have him attached and brought to court. After reviewing the transcript of the trial of this matter, we find no reference by any party to Dr. Mena’s appearance as a witness. While counsel for plaintiffs caused Dr. Quinet to appear in response to a subpoena, he made no attempt to do so in the case of Dr. *773 Mena. Plaintiffs never called Dr. Mena as a witness or questioned Ms failure to appear. Only after trial did plaintiffs complain of Ms failure to appear. Plaintiffs could easily have asked for an attachment to be ordered if they believed Ms testimony to be necessary. Since plaintiffs failed to timely object to Dr. Mena’s failure to appear when it first came to light during trial we cannot say that the trial court abused its discretion in failing to find Dr. Mena in contempt after the fact.
MOTION FOR SANCTIONS
Plaintiffs have filed a motion in this court asMng that an answer to their appeal filed by Dr. Qmnet be dismissed. They farther ask that Dr. Quinet be assessed with sanctions for frivolous appeal. Prior to the filing of plaintiffs’ motion this court dismissed Dr. Qmnet’s answer because it was untimely.
La.C.C.P. art. 2164 provides for the award of damages for frivolous appeal as follows:
li6“The appellate court shall render any judgment wMch is just, legal, and proper upon the record on appeal. The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as m its judgment may be considered eqmtable.”
Damages for frivolous appeal are not to be lightly granted.
“LSA-C.C.P. art. 2164, wMch provides for damages for frivolous appeals, is penal in nature and must be strictly construed. Pension Inv. Corp. v. East Baton Rouge, 583 So.2d 598 (La.App. 1st Cir.1991). Likewise, appeals are favored and penalties for frivolous appeals will not be imposed uMess they are clearly due. See Howard v. Howard, 580 So.2d 696 (La. App. 2d Cir.1991).”
Veron v. Veron, 624 So.2d 1295, 1299 (La. App. 3 Cir.1993), writ denied, 93-2768 (La. 1/7/94); 631 So.2d 453.
This court has consistently held that:
“An award of damages for frivolous appeal is not appropriate uMess it manifestly appears that the appeal is taken solely for the purpose of delay or that appealing counsel does not seriously believe in the position he is advocatmg. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3d Cir.1991)”.
Hodapp v. American Indem. Co., 618 So.2d 32, 35 (La.App. 3 Cir.1993).
Although the answer in this case was not filed timely, we have nothing before us to indicate that it was taken “solely for the purpose of delay” or that appealing counsel did not seriously believe in the position he was advocating. Accordingly, an award of damages for frivolous appeal is not appropriate m this case.
COURT REPORTER COSTS
Finally, the plaintiffs dispute propriety of the trial court’s order by which they were required to comply with local rule 17 of the 15th Judicial District Court. That rMe, as it existed at the time of plaintiffs trial required that plaintiffs deposit $150.00 per day of trial with the court reporter for the costs of taking testimony. Plamtiffs now argue that the rule is invalid as it contravenes La.R.S. 13:961(A) wMch provides that court reporters are to be paid a monthly salary. Further, they complain that no arrangement is made for the return of the deposit if costs are assessed to the defendant.
It appears, however, that this point is now moot. Judgment was rendered against the plaintiffs and costs have been assessed against them. Further, they have taken an appeal and obtained a transcript.
117“A moot case is one which seeks a judgment or decree wMch, when rendered, can give no practical relief. Robin v. Concerned Citizens, St. Bernard, Inc., 384 So.2d 405 (La.1980); Coomes v. Allstate Ins. Co., 517 So.2d 436 (La.App. 1 Cir. 1987); State in Interest of Minor Female Child, 470 So.2d 595 (La.App. 1 Cir.1985).
It is well established that it is the function of appellate courts to render judgments which can be made effective and not to give opimons on moot questions. Savings Bank of Baltimore v. Venture 73, 452 So.2d 395 (La.App. 3 Cir.1984), writ den., 458 So.2d 487 (La.1984); Cox v. Watts, 329 So.2d 917 (La.App. 1 Cir.1976); Brown v. *774 Town of Lake Providence, 200 So.2d 764 (La.App. 2 Cir.1967).”
Roland Const. Co., Inc. v. City of Alexandria, 591 So.2d 808, 810 (La.App. 3 Cir.1991).
We find that the plaintiff would not receive any practical relief from a ruling in this matter. The trial court’s ruling went against them and they obtained a transcript of the proceedings for appeal purposes. It matters little at this point whether they paid in advance or after the fact.
CONCLUSION
We find no error in the rulings of the trial court, or in verdict rendered by the jury. Consequently, the judgment of the trial court is affirmed. Damages for frivolous appeal are denied. Costs of this appeal are to be paid by the plaintiffs.
AFFIRMED.
KNOLL, J., concurs and assigns reasons.