[No. B067936. Second Dist., Div. Six. Dec. 21, 1993.]

PAULA PARRIS, Plaintiff and Appellant, v.
JAMES SANDS et al., Defendants and Respondents.

## Counsel

Borrell & Borrell, Mark Borrell, Lascher & Lascher, Wendy C. Lascher and Gabriele Mezger-Lashly for Plaintiff and Appellant.

Monroy & Weiss and Jerrie S. Weiss for Defendants and Respondents.

## Opinion

**GILBERT, J.**—Plaintiff Paula Parris appeals a judgment, after jury trial, in favor of defendant Doctor James Sands. We affirm and hold Doctor Sands had no duty to inform patient Parris of "schools of thought" regarding asplenic patients and prophylactic antibiotics.

### Facts

In 1975, physicians diagnosed plaintiff Paula Parris as having Hodgkin's disease, a cancer of the lymph nodes. To determine whether the disease had

spread to other parts of her body, surgeons removed her spleen, a body organ with critical immunological functions. Thereafter, her physicians treated her with radiation therapy. In 1980, the cancer reoccurred and Parris received chemotherapy treatments. Since then, her cancer has been in remission.

From time to time following her splenectomy, Parris suffered from upper respiratory infections. Her oncologist, Doctor Robert Ouwendijk, prescribed antibiotics for these respiratory infections on three occasions. On three other occasions, he did not. Based upon his medical tests and Parris's clinical profile, he opined that she probably was not immunocompromised due to her splenectomy. Doctor Ouwendijk believed, however, that "best" clinical judgment required a physician to assume an asplenic patient is immunocompromised.

On May 12, 1988, Parris visited Doctor James Sands at the Ventura Urgent Care Center because she suffered an upper respiratory infection. She complained of a low fever, vomiting, diarrhea, and chest pain. Doctor Sands examined Parris and decided she was febrile and her eardrum appeared "a little dull," a symptom of a viral infection. Doctor Sands heard no cough and found no enlarged lymph nodes in her arms or neck. He performed a white blood cell count and found it to be bordering on normal/high. An independent laboratory reexamined the blood sample and found the white blood cell count to be in the upper range of normal.

Doctor Sands knew Parris had suffered Hodgkin's disease and was asplenic. She had been a patient of Urgent Care Center before and he also noticed her splenectomy scar during his examination.

Doctor Sands diagnosed Parris as suffering from viral flu syndrome. He made "a judgment call" that Parris's immune system was not compromised by reason of her splenectomy. His judgment rested upon her normal white blood cell count, her infrequent infections and the absence of any unusual or obscure infections according to her medical history. Doctor Sands testified at trial that immunocompromised patients commonly suffered from bacterial, yeast or fungal infections. They are also at risk for pneumonia.

Doctor Sands prescribed an anti-inflammatory drug for Parris's pain and fever and an antinausea drug. Because of his conclusion that Parris had a normal immune response to infections, he did not prescribe an antibiotic. Doctor Sands testified that antibiotics generally were not used to treat viral infections. Doctor Sands asked Parris to return in 24 to 48 hours if she did not improve.

Parris's condition appeared to improve the next day but thereafter deteriorated. She did not return to Urgent Care Center. Three days later, her

husband took her to the Ventura County Medical Center emergency room. There, doctors diagnosed her condition as life-threatening bacterial pneumonia. Parris was hospitalized for six weeks and was ventilator-dependent during that time. Although doctors did not expect she would survive, Parris recovered, but she now suffers lung damage from the pneumonia.

Parris brought this action for medical malpractice against defendant James Sands and the Ventura Urgent Care Center. Expert medical testimony was as follows:

Doctor Henry Holderman testified that Doctor Sands treatment was beneath the medical standard of care by not giving Parris antibiotics to prevent possible bacterial pneumonia. He opined that Parris was immunocompromised because she was asplenic and the risk of pneumonia therefore was greater than any risk of taking antibiotics. Doctor Holderman believed Parris was less likely to have developed pneumonia had she received antibiotics from Doctor Sands.

Doctor Daniel Greenberg, a pulmonologist, opined Parris probably suffered from pneumonia when she visited Doctor Sands on May 12, 1988. He also believed Doctor Sands breached medical standards of care by not prescribing antibiotics immediately, considering Parris was asplenic. Doctor Greenberg testified Doctor Sands should have assumed Parris was immunocompromised because many asplenic patients are immunocompromised for years beyond their spleen removal. He believed Parris was mildly immunocompromised.

Doctor Sands testified concerning a "debate" within the medical community in 1988 regarding the length of time an asplenic patient remains immunocompromised following a splenectomy. Although some doctors believed an asplenic patient was immunocompromised forever, other doctors believed the likelihood of immunocompromise decreased with time. Doctor Sands stated that some doctors believed asplenic patients should receive prophylactic antibiotics and other doctors believed such treatment unnecessary.

Doctor William O'Riordan, an emergency care physician, testified Doctor Sands's diagnosis and treatment of Parris fell within the medical standard of care. He did not believe Parris was immunocompromised because of her previous recoveries from upper respiratory infections.

The jury decided Doctor Sands was not negligent in his care and treatment of Parris.

On appeal, Parris argues: 1) the trial court improperly rejected her proposed jury instruction concerning a physician's duty to inform a patient regarding differing "schools of thought" concerning diagnoses or treatments, and 2) the trial court improperly refused to permit Doctor Ouwendijk to testify as an expert witness.

DISCUSSION

I.

Parris contends the trial court improperly rejected this special jury instruction: "A physician rendering a diagnosis or providing treatment has a duty to inform the patient that other members of the medical profession might render a different diagnosis or provide a different treatment based on a contrary recognized school of thought within the medical community. A failure to fulfill such a duty is negligence." This instruction, advising the jury that a patient is entitled to be informed of competing medical views, rests upon dictum in *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443]. Parris also relies upon *Arato* v. *Avedon* (1993) 5 Cal.4th 1172, 1183 [23 Cal.Rptr.2d 131, 858 P.2d 598] and *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1], declaring a physician's duty of disclosure of available choices of proposed therapy and of the dangers potentially involved in each choice. The trial court properly rejected this special instruction.

*Jamison* v. *Lindsay*, *supra*, 108 Cal.App.3d 223, concerned surgery on a young woman to remove a tumor on her right ovary. A pathologist examined the tumor and found it contained both immature and mature cells. The pathologist knew of "divergent opinions" concerning whether the immature cells were malignant or potentially so. (*Id.*, p. 228.) He personally believed the cells were not malignant and so informed the surgeon. The pathologist did not advise the surgeon that other pathologists might opine differently. The patient received no further treatment. Within several months, she developed other, life-threatening malignant tumors, possibly related to her original tumor.

In dictum, *Jamison* said that an appropriate jury instruction, if requested, would have been this: " '[I]t is the duty of a physician or surgeon to disclose to the patient all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery.' [Citation.]" (*Jamison* v. *Lindsay*, *supra*, 108 Cal.App.3d 223, 231.) *Jamison* relied upon the physician's "broad duty of disclosure" enunciated by our Supreme Court in *Truman* v. *Thomas* (1980) 27 Cal.3d 285, 290 [165 Cal.Rptr. 308, 611 P.2d 902].)

Generally, appellate courts have rejected a general duty of disclosure concerning a treatment or procedure a physician does not recommend. (*Mathis* v. *Morrissey* (1992) 11 Cal.App.4th 332, 342, fn. 6 [13 Cal.Rptr.2d 819]—explaining general rule and citing recent cases.) These decisions have restricted plaintiffs to actions under ordinary medical negligence. (*Ibid.*) Thus, in dictum, *Mathis, supra,* rejected the argument that a physician must inform a patient of " 'schools of thought' " based upon views of other health care providers because such duty "would impose an excessively onerous burden upon treating physicians." (*Id.,* p. 344.) Only in the unusual case would such duty be appropriate. (*Vandi* v. *Permanent Medical Group, Inc.* (1992) 7 Cal.App.4th 1064, 1071 [9 Cal.Rptr.2d 463].)

We decline to extend the law to the circumstances here. Expert testimony established that diagnosis of Parris's degree of immunocompromise, if any, and prescribing of prophylactic antibiotics were matters of clinical judgment. Doctor Sands was not recommending prophylactic antibiotics and the duty discussed in *Jamison* would have required him to discuss a procedure he was not recommending. Parris has not cited authority, other than dicta, that would require a *Jamison*-type jury instruction here—a case not involving surgery, cancer diagnosis or cancer treatment or other serious, life-threatening procedures. (e.g., *Mathis* v. *Morrissey, supra,* 11 Cal.App.4th 332, 343-344—a physician should disclose two schools of thought concerning whether a lumpectomy or mastectomy is appropriate to treat breast cancer.)

Parris, however, was not without an appropriate legal theory to recover damages. Negligent failure to advise a patient to pursue a necessary course of treatment is an action under ordinary medical negligence, upon which the jury here received proper instructions. (*Mathis* v. *Morrissey, supra,* 11 Cal.App.4th 332, 342, fn. 6; *Jamison* v. *Lindsay, supra,* 108 Cal.App.3d 223, 231.) At trial, Doctors Holderman and Greenberg testified Doctor Sands was negligent for not assuming Parris was immunocompromised and for thereby not prescribing antibiotics. Had the jury credited this testimony and found Doctor Sands negligent, Parris could have recovered damages.

Parris also complains that BAJI No. 6.03, without her proposed jury instruction based on *Jamison, supra,* misled the jury. BAJI No. 6.03 provides: "Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician is not negligent if, in exercising his or her best judgment, he or she selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

Parris contends this instruction "virtually directed" a verdict for Sands because evidence at trial established more than one recognized treatment for her condition.

We disagree. BAJI No. 6.03 discusses "more than one recognized method of diagnosis or treatment." Doctors Holderman and Greenberg opined Doctor Sands's treatment fell below medical standards, permitting the reasonable inference Doctor Sands's treatment was not one "recognized . . . by all practitioners of good standing." Of course, Doctor Sands testified to differing, recognized approaches to immunocompromised patients and prophylactic antibiotics. The jury could assess the credibility of these experts and decide whether, indeed, different recognized or approved treatments existed. Thus, BAJI No. 6.03 did not compel a verdict in favor of Doctor Sands.

## II.

■ Parris claims the trial court improperly refused to permit Doctor Ouwendijk to opine how he would have treated her had she visited him instead of Doctor Sands. She contends the trial court erroneously believed she should have included Doctor Ouwendijk as an expert witness on her expert witness declaration under Code of Civil Procedure section 2034, subdivision (a)(2) and (f)(2). She points out Doctor Ouwendijk was her treating physician and hence, not a retained expert within section 2034, subdivision (a)(2). (*Hurtado* v. *Western Medical Center* (1990) 222 Cal.App.3d 1198, 1203 [272 Cal.Rptr. 324].) Doctor Sands does not respond to this argument.

Any error was harmless because it is not reasonably probable Parris would have obtained a more favorable result otherwise. Doctor Ouwendijk testified it was his "best" clinical judgment to assume an asplenic patient was immunocompromised and to administer prophylactic antibiotics. Doctors Holderman and Greenberg testified it fell below the standard of care not to do so. Testimony concerning Doctor Ouwendijk's hypothetical treatment of Parris on May 12, 1988, would not have added much to this expert testimony concerning Doctor Sands's treatment.

Accordingly, the judgment is affirmed. Parris shall bear costs on appeal.

Stone (S. J.), P. J., and Yegan, J., concurred.

A petition for a rehearing was denied January 20, 1994.