549 S.E.2d 681

**Jonella R. YATES and Donald Yates, Her Husband, Plaintiffs Below, Appellants,**

v.

**UNIVERSITY OF WEST VIRGINIA BOARD OF TRUSTEES, A Statutory West Virginia Agency, Defendant Below, Appellee.**

No. 28241.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 2001.

Decided May 15, 2001.

Concurring Opinion of Justice Starcher July 9, 2001.

J. Robert Rogers, William D. Thompson, Law Office of J. Robert Rogers, Hurricane, for the Appellants.

Wesley W. Metheney, Paul T. Farrell, Jr., for Amicus Curiae West Virginia Trial Lawyers Association.

Edward Kowal, Jr., Dustin C. Haley, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, for the Appellee.

MAYNARD, Justice.

Jonella Yates and her husband, Donald Yates, the appellants and plaintiffs below in a medical malpractice case, appeal the final order of the Circuit Court of Cabell County entered December 3, 1999. The appellants raise several issues on appeal to this Court. After careful consideration of these issues, we reverse the judgment of the circuit court.

## I.

## FACTS

On May 4, 1994, appellant, Jonella Yates ("Mrs.Yates") was hospitalized at St. Mary's Hospital in Huntington, West Virginia, with complaints of chest pain.[1] Mrs. Yates' attending physician at St. Mary's Hospital was Dr. Gretchen Oley, an internal medicine specialist and employee of the Marshall University School of Medicine which was governed at this time by the appellee, University of West Virginia Board of Trustees.[2]

On May 6, 1994, a cardiac catheterization was performed on Mrs. Yates by Dr. Robert Touchon and she was diagnosed with a 60% stenosis of the left circumflex coronary artery. In order to assess the significance of Mrs. Yates' condition, she underwent a stress test[3] on May 9 which was stopped because she experienced a rapid heart beat and chest pain.

On May 10, Dr. Mark Studeny performed an atherectomy on Mrs. Yates, which is the insertion of a catheter with a small blade on the end and the cutting away of deposits from the lining of the artery. Incidental to this procedure, Dr. Studeny discovered that Mrs. Yates' right iliac artery was blocked. The iliac artery is the artery which branches off from the abdominal artery and delivers blood to the legs. There is evidence that this blockage was a rare complication resulting from injury to the internal wall of the artery occurring during the catheterization procedure of May 6.[4] Dr. Studeny consulted with Dr. Dennis Burton, a radiologist, who attempted, the next day, to dissolve the blockage in the right iliac artery through the performance of an angioplasty, stent placement, and the administration of urokinase, an enzyme used intravenously to dissolve blood clots.

Subsequent angiograms[5] on May 12 revealed persistent blockage in the iliac artery

1. In February, 1994, Mrs. Yates was diagnosed with a 70% stenosis of the left circumflex coronary artery. In March, 1994, she underwent an angioplasty to remove the stenosis at another hospital. A stenosis is defined as "an abnormal condition marked by the tightening or narrowing of an opening or passageway in a body structure." The Signet Mosby Medical Encyclopedia Revised Edition 721 (Walter D. Glanze, et al., eds.1996). Angioplasty is the "[a]lteration of a blood vessel, either surgically or by dilating the vessel using a balloon [in the space within the vessel]." Taber's Cyclopedic Medical Dictionary 107 (Clayton L. Thomas, ed. 18th ed.1997).

2. Marshall University is a state institution of higher learning which was governed in 1994 by the University of West Virginia Board of Trustees. This board of trustees was abolished on June 30, 2000 and replaced by a higher education interim governing board to govern public higher education in West Virginia. See W.Va. Code §§ 18B–2–1(e) and (f) (2000) and W.Va. Code § 18B–1C–2 (2000). This change has no bearing on this case.

3. A stress test is

 [a] method of evaluating cardiovascular fitness. While exercising, usually on a treadmill or a bicycle ergometer, the individual is subjected to steadily increasing levels of work. At the same time, the amount of oxygen consumed is being determined, and an electrocardiogram (ECG) is being monitored. If certain abnormalities are noted in the ECG or chest pain develops, the test is terminated.

 Taber's Cyclopedic Medical Dictionary, supra, 1845.

4. During the catheterization, the right femoral artery was entered with the catheter. The femoral artery is located immediately below the iliac artery.

5. An angiogram is "an x-ray of a blood vessel after injection of a contrasting substance." Mosby Medical Encyclopedia, supra 41.

and an additional blockage in the trifurcation of the popliteal artery. This artery is located at the back part of the knee joint and branches into the anterior and posterior tibial and peroneal arteries.[6] That evening, Dr. Timothy Robarts, a surgical resident, noted that "if foot not better in a.m. (pulseless now), [Mrs. Yates] will need re-agram and likely embolectomy and fem fem crossover."[7] Generally, from the time of the discovery of the blockage in the right iliac artery, until May 16, when surgery was ultimately performed, the condition of Mrs. Yates' right foot waxed and waned. Sometimes foot pulses were palpable, or apparent to the touch, and sometimes not. At times the pulses were dopplerable, or audible through a handheld device, and at times they were not. The foot alternated between being cool to the touch and pale or blue to being pink and warm.

The evidence indicates that on the morning of May 13, Dr. Venkata Raman, a vascular surgeon, became involved in Mrs. Yates' treatment for the first time. Dr. Raman was an employee of the Marshall University School of Medicine. Evidence was presented that Mrs. Yates' right foot had improved by the morning of May 13. Late that night, an angiogram showed that the iliac artery, the trifurcation, and its adjoining vessels were now open. Nevertheless, Mrs. Yates' right foot continued to show signs of ischemia, or lack of oxygen. It was thought that, although all of the major arteries of the right leg were now open, that Mrs. Yates was suffering from blood clots in the small vessels of the foot which carry blood from the major arteries to the muscles. For this reason, the infusion of urokinase was continued to dissolve these clots.

In the early morning hours of May 14, Mrs. Yates suffered a retroperitoneal hematoma which is a mass of blood in the membrane lining the abdominal cavity apparently caused by a break in a blood vessel. Evidence was presented that this break in the vessel may have occurred during the angioplasty and initial infusion of urokinase on May 12. The hematoma resulted in significant blood loss which was treated with several blood transfusions. Also, infusions of urokinase and administration of heparin, an anticoagulant use to prevent clotting, were discontinued at this time in order to aid in stopping the blood loss. The blood transfusions were successful in treating the hematoma.

However, after the infusion of urokinase and administration of heparin were stopped, Mrs. Yates' right leg artery reclotted. Also, the condition of her right foot continued to worsen. As a result, on May 16 Dr. Raman performed an embolectomy on Mrs. Yates to remove the blood clot and a fasciotomy to release the pressure in her swollen and tender right calf. It was subsequently discovered that Mrs. Yates had suffered significant muscle death in her right foot and lower leg, and a below the knee amputation was performed on May 29.

On May 6, 1996, Mrs. Yates and her husband brought a medical malpractice action against all of the doctors involved in her treatment, Radiology, Inc., of which Dr. Burton was an employee, and St. Mary's Hospital. By the time of the trial, in June, 1999, all of the defendants had been dismissed from the case except the University of West Virginia Board of Trustees who was substituted in lieu of defendants Drs. Oley and Raman.

At trial, the appellants' theory was that Dr. Oley, Mrs. Yates' attending physician, and Dr. Raman, her vascular surgeon, were tardy in their treatment of her right iliac artery, and this tardiness resulted in the amputation. Specifically, they alleged that when the blockage was first discovered on May 10, Dr. Oley should have immediately consulted with a vascular surgeon instead of a radiologist. Also, they alleged that Dr. Raman, upon becoming involved in Mrs.

---

**6.** *See* Henry Gray, Anatomy, Descriptive And Surgical 502 (T. Pickering Pick & Robert Howden, eds., 1901 ed. 1974) ("Gray's Anatomy").

**7.** An embolectomy is a surgical procedure to remove blood clots. A fem fem crossover would have entailed the running of a vessel from the femoral artery in the left leg to the right femoral artery in order to restore the blood supply to the right leg.

Yates' treatment on May 13, should have immediately performed surgery rather than assenting to the continued infusion of urokinase. In support of this theory, the appellants presented the testimony of Dr. Alex Zachariah, a cardiovascular and thoracic surgeon, who opined that Dr. Oley deviated from the applicable standard of care by not consulting a vascular surgeon on May 10, and that Dr. Raman was negligent in not operating to remove the blood clots on May 13.

In response, the appellee presented the testimony of Dr. John Bergan, a vascular surgeon, who opined that interventional radiology is an acceptable method of treating the blockage of an artery so that Dr. Oley was not negligent in consulting a radiologist rather than a vascular surgeon. Likewise, he testified that Dr. Raman was not negligent in assenting to the radiology treatment already initiated when he became involved in the case on May 13.

After a five-day trial, the jury returned a verdict for the appellee. The trial court subsequently denied the appellants' motion to set aside the verdict and for a new trial. As a result, the appellants now appeal to this Court.

## II.

### DISCUSSION

■ The appellants complain, first, that the trial court abused its discretion in admitting the expert opinion testimony of Dr. John Bergan because there was no evidence that Dr. Bergan was licensed to practice medicine in one of the states of the United States as required by W.Va.Code § 55-7B-7 (1986).[8] The appellee responds that the appellants waived this assignment of error by failing to make a timely objection at trial. We agree.

---

8. According to W.Va.Code § 55-7B-7 in part:
 The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that .... (d) such expert maintains a current license to practice medicine in one of the states of the United States[.]

The record shows that prior to Dr. Bergan's testimony, appellants' counsel objected to Dr. Bergan as a witness on the grounds that Dr. Bergan and Dr. Raman were friends; Dr. Bergan testified previously on behalf of Dr. Raman in a medical malpractice case; on the evening prior to Dr. Bergan's scheduled testimony, Dr. Bergan helped Dr. Raman to prepare for his impending testimony; and Dr. Bergan has not performed vascular surgery on the arterial system in the last ten years. These objections were rejected by the trial court, and Dr. Bergan proceeded to testify on Friday, June 18. On cross-examination, appellants' counsel questioned Dr. Bergan on the matters raised in their objections. On Tuesday, June 22, following the testimony of Dr. Raman, the defense rested.[9] At that point, appellants' counsel moved to strike the testimony of Dr. Bergan because it was not disclosed whether Dr. Bergan was licensed to practice medicine in a state of the United States.[10]

■ Our rules clearly indicate that a party who assigns error on appeal based on a trial court's admission of evidence must timely object to that evidence. Rule 103 of the West Virginia Rules of Evidence states:

(a) *Effect of erroneous ruling.* ----- Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(b) Objection. ----- In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of the objection, if the specific ground was not apparent from the context[.]

In addition, this Court has held that "[a] proper objection to the competency of a wit-

---

9. Monday, June 21, 1994 was a state holiday and court was not in session.

10. Interestingly, when the trial court responded that appellants' objection should have been brought to the court's attention at the time of Dr. Bergan's testimony, appellants' counsel replied, "[w]ell, judge, once you do that, you cure his own defect."

ness must be made and the point saved when the witness or his testimony is offered at trial[.]" Syllabus Point 3, in part, *First Nat. Bank Of Ronceverte v. Bell,* 158 W.Va. 827, 215 S.E.2d 642 (1975).

The appellants did not timely object to Dr. Bergan's testimony when it was offered at trial, despite the fact that they had the opportunity to conduct voir dire of Dr. Bergan or to cross-examine him concerning his licensure to practice medicine. In their reply brief to this Court, the appellants argue that Rule 103 permits either a timely objection *or* a motion to strike so that they adequately preserved the alleged error. However, the point of Rule of Evidence 103 is that a motion to strike, as well as an objection, must be timely. This is because a timely objection or motion to strike "gives both the court and the party's opponent fair warning and a timely opportunity to acknowledge and correct the errors so that cases can be decided squarely on the merits." Franklin D. Cleckley, *Handbook On Evidence For West Virginia Lawyers,* Vol. 1, § 1–7(B)(7)(a), at 1–62 (4th ed.2000). A timely objection by the appellants would have given the appellee an opportunity to clarify Dr. Bergan's licensing status, and the trial court could have ruled accordingly. Instead, appellants' counsel waited four days until Dr. Bergan was no longer available before making their motion to strike. Accordingly, we decline to consider the appellants' first assignment of error.

■ The appellants next aver that the trial court erred in denying their motions for a judgment as a matter of law [11] at the close of the evidence and subsequent motion to set aside the jury verdict.[12] According to the appellants, Dr. Oley's and Dr. Raman's failure to timely order and/or perform surgery to remove the clot in Mrs. Yates' iliac artery is an "open and shut case of liability." The appellants conclude that Drs. Oley and Ra-

man did nothing to treat Mrs. Yates' clotted vessels and that this is not an acceptable standard of care.

■ "We review *de novo* ... the denial of the [judgment as a matter of law]" made pursuant to Rule 50(a) of the West Virginia Rules of Civil Procedure. *Adkins v. Chevron, USA, Inc.,* 199 W.Va. 518, 522, 485 S.E.2d 687, 691 (1997). This Court has said that a judgment as a matter of law should be granted at the close of the evidence when, after considering the evidence in the light most favorable to the nonmovant, only one reasonable verdict is possible. *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 481 n. 6, 457 S.E.2d 152, 158 n. 6 (1995). In addition, "[u]pon a motion for a [judgment as a matter of law], all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." Syllabus Point 5, *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973).

The appellee's evidence indicates that upon discovery of the clot in Mrs. Yates' iliac artery on May 10, 1994, Dr. Oley, her attending physician, consulted with Dr. Studeny, a cardiologist, and it was decided that the clot would be treated by means of interventional radiology instead of surgery. On May 12, Dr. Burton, a radiologist, attempted to dissolve the clot with angioplasty, stent placement, and administration of urokinase, an enzyme used intravenously to dissolve clots. Dr. Raman became involved in Mrs. Yates' treatment on the morning of May 13, and by late that night the major vessels of Mrs. Yates' right leg were open. There was also testimony that it was only after the administration of urokinase was stopped, in order to treat Mrs. Yates' hematoma, that blockages formed in the microscopic vessels of the right foot which ultimately lead to the amputation. Concerning the choice of interventional radiology rather than surgery to treat the

---

**11.** Rule 50 of the West Virginia Rules of Civil Procedure was amended effective April 6, 1998 so that a motion for a directed verdict is now referred to as a motion for judgment as a matter of law. Accordingly, we will use the term "judgment as a matter of law" in this opinion.

**12.** The appellants' motion to set aside the verdict included a motion for a new trial, and the appel-

lants also assert that the trial court erred in denying this motion. Because the legal issues raised in the appellants' motion for a new trial are included in the other assignments of error raised in this appeal, we do not find it necessary to discuss the trial court's denial of the motion for a new trial as a separate issue.

blockage in Mrs. Yates' iliac artery, the appellee's expert, Dr. John Bergan, opined that Drs. Oley and Raman did not deviate from the standard of care because both interventional radiology and surgery are valid methods of treatment.

In light of this evidence and resolving all doubts and inferences in favor of the appellee, we do not believe that only one reasonable verdict was possible. Accordingly, we conclude that the trial court was correct to deny the appellants' motion for a judgment as a matter of law at the end of the evidence.

 For the same reason, we believe that the trial court did not err in denying the appellants' motion to set aside the jury verdict. "An appellate court will not set aside the verdict of a jury, founded on conflicting testimony and approved by the trial court, unless the verdict is against the plain preponderance of the evidence." Syllabus Point 2, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937). Additionally,

> [i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

Syllabus Point 3, *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963).

Again, we believe that the evidence, set forth above, is sufficient to support the jury's verdict. There was conflicting evidence whether Mrs. Yates' treatment, performed by Drs. Oley and Raman, breached the applicable standard of care. The jury obviously found the evidence presented by the appellee to be more credible, and concluded that Drs. Oley and Raman were not negligent. Accordingly, we find no error in the trial court's denial of the appellants' motion to set aside the verdict based on insufficiency of the appellee's evidence.

The third assignment of error raised by the appellants is that the trial court erred in giving a jury instruction concerning multiple methods of treatment. This instruction stated:

> A doctor is not negligent if he selects one of several or more approved methods of treatment within the standard of care. In other words, if there is more than one generally recognized method of diagnosis or treatment and no one method is used exclusively or uniformly by all physicians, a physician is not negligent if, in the exercise of his medical judgment, he selects one of the approved methods within the standard of care—even if you believe in retrospect that the alternative chosen may not have been the best method of treatment—as long as he utilizes that method of treatment in a non-negligent manner as otherwise instructed by the Court.

The appellants argue that this instruction is faulty because it allows for the possibility that the only doctors in the world who would choose the alternate treatment are the defendant doctor and his testifying expert. The appellants suggest that this instruction should be abandoned or modified to require that a "considerable number" of doctors adhere to a method of treatment before it is recognized as a valid alternative treatment method.

We decline to abandon the multiple methods of treatment instruction. Rather, this Court believes that the multiple method of treatment instruction is a necessary recognition that the practice of medicine is an inexact science often characterized by a myriad of therapeutic approaches to a medical problem, all of which may command respect within the medical profession. This instruction properly informs jurors that a physician's professional judgment in choosing the most effective treatment in a given situation is a fundamental and indispensable element of practicing medicine. Also, the instruction relieves jurors of the task of deciding which treatment, among several alternatives, should have been performed by a defendant physician. In addition, the instruction guards against the propensity to assess a physician's judgment with the advantage of hindsight. Finally, our research discovered

that a significant number of other jurisdictions continue to utilize the instruction.[13]

 We do, however, share the appellants' concern that the only doctors in the world who would choose the alternative treatment are the defendant physician and his testifying expert. For this reason, we clarify that it is insufficient to show that there exists only a small minority of physicians who agree with the defendant's challenged treatment. On the other hand, it is not necessary for the defendant to show that the challenged treatment is utilized by the majority of physicians. Rather, the defendant must show that the challenged treatment enjoys such substantial support within the medical community that it truly is *generally* recognized. In order to make this showing, the defendant's expert must opine that the challenged method of diagnosis or treatment has substantial support and is generally recognized within the medical community. This testimony should usually be supported by sufficient extrinsic evidence such as medical textbooks, treatises, journal articles, or other similar evidence. Upon a proper showing by the defendant, a multiple methods of treatment instruction may properly be given. Once the trial court makes this determination, it is ultimately a question for the jury to determine whether it believes that the challenged method of diagnosis or treatment is generally recognized, and the burden of per-

---

**13.** Cases in which the instruction was approved or recognized include *Pesek v. University Neurologists Assn., Inc.,* 87 Ohio St.3d 495, 721 N.E.2d 1011 (2000) (although found improper under the specific facts of this case because there was insufficient evidence to support it); *Bickham v. Grant,* Docket No. 97–CA–01639–COA, 2000 WL 1342702 (Miss.App. Sept.19, 2000) (giving of instruction was not error because the evidence supported it); *Finley v. Culligan, M.D.,* 201 Wis.2d 611, 548 N.W.2d 854 (Ct.App.1996) (no error in the giving of the instruction because the testimony supported it); *McCoy v. Calamia,* 653 So.2d 763 (La.Ct.App.1995) (noting that the correctness of the charge is supported by state case law); *Parris v. Sands,* 25 Cal.Rptr.2d 800, 21 Cal.App.4th 187 (1993); *Schwab v. Tolley,* 345 So.2d 747 (Fla.Dist.Ct.App.1977) (noting that instruction given was substantially same as that recommended by the Florida Supreme Court in the Florida Standard Jury Instructions); *Wasfi v. Chaddha,* 218 Conn. 200, 588 A.2d 204 (1991); *Jones v. Chidester, M.D.,* 531 Pa. 31, 40, 610 A.2d 964, 969 (1992) (stating that "[w]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise."); *DiFranco v. Klein, M.D.,* 657 A.2d 145, 148 (R.I.1995) (disapproving of such phrases as "good faith," "honest mistake," and "honest error in judgment," but reaffirming rule that "as long as a physician exercises the applicable degree of care, he or she may choose between differing but accepted methods of treatment and not be held liable."); *Riggins v. Mauriello, D.O.,* 603 A.2d 827, 831 (Del.1992) (disapproving of "mere error of judgment" charge and opining that proper instruction should state that "when a physician chooses between appropriate alternative medical treatments, harm which results from the physician's good faith choice of one proper alternative over the other is not malpractice"); *Ouellette v. Subak,* 391 N.W.2d 810, 816 (Minn. 1986) (proper instruction informs that "the fact a doctor may have chosen a method of treatment that later proves to be unsuccessful is not negligence if the treatment chosen was an accepted treatment on the basis of the information available to the doctor at the time a choice had to be made"); *Peters v. Vander Kooi,* 494 N.W.2d 708 (Iowa 1993); *Brackett v. Coleman,* 525 So.2d 1372 (Ala.1988); *Fridena v. Evans,* 127 Ariz. 516, 622 P.2d 463 (1980); *Hurst v. Dougherty, M.D.,* 800 S.W.2d 183, 186 (Tenn.Ct.App.1990) (citing Tennessee Pattern Instruction, § 6.15 which provides that "[w]hen there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician [surgeon] is not negligent if, in exercising his best judgment, he selects one of the approved methods that later turns out to be unsuccessful, or one not favored by certain other practitioners"); *Juedeman v. Montana Deaconess Medical Center,* 223 Mont. 311, 322, 726 P.2d 301, 307–308 (1986) (where plaintiffs did not dispute the use of the instruction when supported by the evidence but contended that it was not supported by the evidence, the court concluded that "[w]hile the instruction is subject to some question because it is a comment upon the evidence … it was not reversible error to have given the instruction"); *Graham v. Keuchel, D.O.,* 847 P.2d 342 355 (Okla.1993) (finding "mistake of judgment" instruction to be error when not placed "in its proper context—i.e., defines it as a situation in which the doctor faces a choice of alternative treatments"); *Watson v. Hockett,* 107 Wash.2d 158, 165, 727 P.2d 669, 674 ("error of judgment" instruction should "be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses"); and *Butler v. Naylor, M.D.,* 377 Utah Adv. Rep. 9, 987 P.2d 41 (1999) (finding sufficient evidence that the surgical procedure used by the defendant is recognized by a respectable portion of the medical community).

suasion on that issue remains with the plaintiff.

■ Therefore, we hold that in medical malpractice cases, the "multiple methods of treatment" jury instruction (which states that a health care provider is not negligent if he or she selects and utilizes in a non-negligent manner one of two or more generally recognized methods of diagnosis or treatment within the standard of care) is appropriate where the evidence shows that the challenged method of diagnosis or treatment enjoys such substantial support within the medical community that it is, in fact, widely and generally recognized. The necessity of presenting evidence sufficient to support a multiple methods of treatment instruction rests with the defendant.[14]

■ Applying this standard to the present set of facts, our review of the record shows that the defendant's evidence on this issue was insufficient to support a multiple methods of treatment instruction, in that Dr. Bergan opined that Drs. Oley and Raman did not deviate from the applicable standards of care in their treatment of Ms. Yates but presented no extrinsic evidence in support of this testimony. Therefore, the defendant did not meet its burden of proof. In determining the effect of the multiple methods of treatment instruction, we are mindful that "[a]n erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." Syllabus Point 2, *Hollen v. Linger*, 151 W.Va. 255, 151 S.E.2d 330 (1966). A party is prejudiced when his or her substantial rights are affected or when "there is a reasonable probability that the jury's verdict was affected or influenced" by the improper instruction. *Ten-*

*nant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 111, 459 S.E.2d 374, 388 (1995). Because the primary issue in this case concerned the propriety of Drs. Oley's and Raman's decision to use interventional radiology rather than immediate surgery as the preferred method of treating Ms. Yates's blockage, we find that there is a reasonable probability that the jury's verdict was influenced by the improper instruction and, thus, constitutes reversible error. Upon remand, the burden rests with the appellee to present additional evidence to support a multiple methods of treatment instruction.[15]

Next, the appellants argue that it was prejudicial error for the trial court to give a jury instruction concerning mistakes in judgment.. The appellee responds that any error in giving the instruction was harmless.

■ The complained of instruction stated:

A health care provider who exercises ordinary skill and care while keeping within recognized and approved methods within the standard of care is not negligent because [of] a reasonable and honest mistake of judgment. On the other hand, it is no defense for a health care provider to say that he exercised his best judgment, if that judgment breached the standard of care.

In the recent case of *Pleasants v. Alliance Corporation*, 209 W.Va. 39, 543 S.E.2d 320 (2000), we disapproved of the "error in judgment" instruction and held in Syllabus Point 5:

The "mistake of judgment" jury instruction, which this Court first approved in *Dye v. Corbin*, 59 W.Va. 266, 53 S.E. 147 (1906), wrongly injects subjectivity into an objective standard of care, is argumenta-

---

14. We emphasize that this rule is not applicable in cases concerning the administration of experimental drugs and experimental treatment.

15. We wish to make clear that this new rule applies only to the issue of whether a multiple methods of treatment instruction is to be given. The standard has no bearing on the issue of whether the defendant in a medical malpractice case presented sufficient evidence to withstand a judgment as a matter of law. As stated previously, the appellee presented sufficient evidence so that a reasonable jury could find that the conduct

of Drs. Oley and Raman was within the standard of care. The standard applies, rather, only in those instances where a defendant wants the trial court to instruct the jury on multiple methods of treatment. In such instances, the defendant must present the additional evidence, and assume the additional burden of proof, set forth above. If, however, the defendant does not seek the multiple methods of treatment instruction, he or she does not have to meet the additional burden of proof.

tive and misleading, and should no longer be used to instruct the jury concerning the relevant standard of care in a medical malpractice action. Accordingly, we hereby overrule *Dye v. Corbin,* 59 W.Va. 266, 53 S.E. 147 (1906), and its progeny, insofar as those cases approve the giving of a "mistake of judgment" instruction.

However, we found in *Pleasants* that the giving of the instruction was harmless error.[16]

■ Again, the primary issue in this case concerned the judgment of Drs. Oley and Raman in choosing to treat Mrs. Yates' blocked artery with interventional radiology rather than immediate surgery to remove the blockage.[17] Accordingly, an instruction which indicates that a mistake in judgment is not negligent as long as it is "reasonable and honest" more likely than not influenced the jury's decision. Said another way, there is a reasonable probability that the jury's verdict was influenced by the erroneous instruction. Also, any effect that the giving of the instruction had on the jury was compounded by the closing argument of appellee's counsel in which he made several references to it.[18] Finally, many of the courts which have disapproved of the mistake of judgment instruction consequently have reversed the judgment below.[19] Therefore, we conclude that the circuit court's giving of the mistake of

---

16. In *Pleasants,* we explained our finding of harmless error as follows:

> Despite our decision to overrule *Corbin,* we do not find reversible error on the basis of the giving of the "mistake of judgment" instruction in this case. Since the remaining instructions properly advised the jury regarding the elements necessary to prove a case of medical malpractice, we find the giving of the instruction to be harmless error. Other appellate courts have similarly concluded that a new trial is not required following the giving of a "mistake of judgment" instruction, which the court subsequently finds to be in error, provided the remainder of the charge correctly stated the standard for proving negligence.

*Pleasants,* 209 W.Va. at 50–51, 543 S.E.2d at 331–332 (citations omitted).

17. This is in contrast to the underlying facts in *Pleasants* where an emergency room doctor failed to properly diagnose a patient's rare condition, discharged the patient within two hours of her arrival at the hospital, and the patient died within a matter of hours of returning home. The appellant's theory of malpractice was the appellee's failure to keep the patient at the hospital for further observation and administration of intravenous fluids. Therefore, the "mistake of judgment" instruction would have been for the purpose of apprising the jury that the decision to release the patient, rather than keeping her at the hospital for observation, was not negligent if it was a reasonable and honest mistake of judgment within the standard of care. The appellees argued to the jury that the emergency room doctor gave the patient's mother the option of taking her daughter home after the examination or permitting her to remain at the hospital for further observation. The decision was made to return home and the patient left the hospital with instructions that she was to be watched closely and returned to the hospital as indicated by the abdominal pain sheet.

Given the doctor's initial failure to properly diagnose, his judgment concerning a proper treatment does not assume the importance that it does in the instant case where Mrs. Yates was properly diagnosed and the primary issue then became the most appropriate treatment for her condition. In light of the evidence, the *Pleasants* jury could have concluded that even had the patient remained at the hospital for observation she still would have died since the only method of treatment for her condition was a combination of antibiotics and surgical resection. Finally, the jury could have concluded that the decision to return home was made primarily by the patient's mother rather than the emergency room doctor. These possibilities make it much less likely that the *Pleasants* jury was influenced in its decision by the "mistake of judgment" instruction.

18. For example, appellee's counsel argued:

> "[A]n honest mistake of judgment, as long as it is within that standard of care, does not give rise to damages or a finding of negligence.
> .... [Medical malpractice law] even allows mistakes of judgment, as long as those — as that conduct is within the standard of care.
>
> \* \* \* \* \* \*
>
> A doctor is not negligent if there is an honest mistake of judgment. That's the law. That's what Judge Cummings told you".

19. *See Shumaker v. Johnson,* 571 So.2d 991 (Ala.1990); *Riggins v. Mauriello, D.O.,* 603 A.2d 827 (Del.1992); *Veliz v. American Hospital, Inc.,* 414 So.2d 226 (Fla.Dist.Ct.App.1982); *Leazer v. Kiefer, M.D.,* 120 Idaho 902, 821 P.2d 957 (1991); *Ouellette v. Subak,* 391 N.W.2d 810 (Minn.1986); *Parodi v. Washoe Medical Center, Inc.,* 111 Nev. 365, 892 P.2d 588 (1995); *Kurzner v. Sanders,* 89 Ohio App.3d 674, 627 N.E.2d 564 (1993); *Rogers v. Meridian Park Hospital,* 307 Or. 612, 772 P.2d 929 (1989); *DiFranco v. Klein, M.D.,* 657 A.2d 145 (R.I.1995); *Shamburger v. Behrens,* 380 N.W.2d 659 (S.D.1986); *Rooney v. Medical Center Hospital Of Vermont, Inc.,* 162 Vt. 513, 649 A.2d 756 (1994); and *Teh Len Chu v. Fairfax Emergency Medical Associates, Ltd.,* 223 Va. 383, 290 S.E.2d 820 (1982). *But see contra, Baker v.*

judgment jury instruction constitutes reversible error.[20]

## III.

## CONCLUSION

In sum, because we find that the circuit court's giving of the multiple methods of treatment and mistake of judgment jury instructions prejudiced the appellants, we reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

STARCHER, Justice, concurring.

(Filed July 9, 2001)

I agree with the majority opinion's reversal of the circuit court's judgment for the defendant in the instant case. The instructions given by the circuit court to the jury—particularly the "mistake of judgment" instruction and the "multiple methods of treatment" instruction—thoroughly muddled the duty of care that the jury could believe the defendant was required to exercise, and thereby adversely impacted upon the jury's verdict.

The mistake of judgment instruction and the multiple methods of treatment instruction take an objective standard of care and redefine the standard in a subjective, argumentative fashion. As the Court makes clear in the instant case, these instructions simply shouldn't be used.

The "mistake" or "error" of judgment instruction, given by the circuit court, was recently disapproved of by this Court in Syllabus Point 5 of *Pleasants v. Alliance Corporation*, 209 W.Va. 39, 543 S.E.2d 320 (2000) because the giving of a "mistake of judgment" instruction in a medical malpractice case—or any case—is fertile ground for jury confusion. A juror's attention should be focused on the essential elements of the action: did the defendant doctor owe the plaintiff a duty of due care, and did the defendant

breach that duty? The question "did the doctor make an honest mistake?" wrongly adds moral subjectivity to what is supposed to be an objective duty of care.

The mistake of judgment instruction blatantly suggests that a lesser duty of care exists for medical providers. While the average citizen can be held liable for not being careful under the given circumstances, a "mistake of judgment" instruction implies that a doctor's conduct could be excused if the doctor made an "honest mistake." A juror could infer from the instruction that a doctor can only be held liable for making a "dishonest" mistake—which I guess would mean making a mistake and then lying about it—or for intentionally harming the patient.

If a driver "honestly" just didn't see that a stoplight was red because he was adjusting the radio and drove through the light, hitting another car and injuring its occupants, and the driver admits that "whoops, I made a mistake, but it was an honest mistake," should we excuse the driver's carelessness? Should we excuse the driver's judgment call to adjust the radio knob rather than watch the road? Of course not. The driver's "mistake of judgment" in not paying attention to traffic signals cannot absolve the driver for any liability.

An *amicus* brief filed by the West Virginia Trial Lawyers Association suggests that the "mistake of judgment" instruction in medical malpractice cases comes in many forms, and that a common theme in the instruction is the use of subjective, misleading, and argumentative terms to state the defendant doctor's standard of care. One variant is an "extraordinary or ideal standard of care" instruction, which states:

Health care providers are bound to conform to the applicable standard of reasonable skill and care. The law does not require infallibility, prophetic insight, or even a satisfactory outcome. The Defendant [health care provider] cannot be held

*Werner*, 654 P.2d 263 (Alaska 1982); *Morlino v. Medical Ctr.*, 152 N.J. 563, 706 A.2d 721 (1998); and *Peters v. Vander Kooi*, 494 N.W.2d 708 (Iowa 1993).

20. In light of our reversal of the judgment below based on the giving of the jury instructions, we do not find it necessary to discuss the appellant's final assignment of error concerning the allegedly improper closing argument of appellee's counsel.

liable for a failure to exercise some extraordinary or ideal degree of care.

Another variation on the theme is a "no retrospect imposed" instruction:

The jury is instructed that it must consider the conduct of the Defendant [health care provider] based on the circumstances at the time of her treatment of the Plaintiff's decedent; in other words what she knew or reasonably should have known at that time, and without the knowledge that Plaintiff's decedent would later die. Physicians are not charged with prophetic foresight before the fact; neither can they be judged on the benefit of perfect hindsight and retrospect after the fact. They are simply obliged to consider and act upon those things which they, in the exercise of reasonable care, know or should know at the time.

And lastly, there is an instruction that the outcome of a case is not guaranteed:

You are instructed that under West Virginia law, in the absence of a written guarantee, and it is agreed that no such guarantee was made in this case, a claim against a health care provider cannot be based upon an alleged guarantee that treatment of a patient will be successful or that nothing unfortunate will occur in the process. Rather, the care giver's duty is to exercise that degree of reasonable care and skill which is ordinarily employed by others in the same profession or specialty. Physicians, by undertaking the care of a patient, do not and cannot guarantee against injury or other misfortune. Rather the law imposes only an obligation to use ordinary care. It is, of course, possible that an unfavorable result or consequence will occur notwithstanding the exercise of ordinary care.

Each one of these instructions employs argumentative terms, subjective terms, or terms designed to obfuscate the doctor's simple duty: to act as a reasonable health care provider under similar circumstances. The theme of these instructions is similar: people make mistakes, and when they do, they should be forgiven. While this may be a good rule by which to live, it is not the legal standard by which a tortfeasor is judged. Neither these instructions nor ones similar to them should be given to a jury.

The rule in every tort case is that a defendant owes the plaintiff a duty of care; when a breach of that duty proximately causes another harm, the defendant should be liable for that harm. Whether it was an honest "mistake of judgment," or whether the harm wasn't prophesied by the defendant is irrelevant. The majority's opinion makes clear that this same rule applies to the medical profession.

The multiple methods of treatment instruction [1] can have the same effect as the mistake of judgment instruction, if it is improperly used. A minority of jurisdictions have rejected the instruction outright, but most have simply modified the instruction to limit its use. The majority opinion makes clear that the burden is on a defendant to show that multiple methods of treatment were available to the reasonable prudent doctor to choose between, and these methods were generally recognized within the medical community.

It appears fair to advise a jury, in a complex medical case, that doctors have available varying means to treat patients, all of which might be scientifically accepted. (For that matter, it would be fair to advise any jury in any complex case that the parties' experts are presenting alternative courses of action.) The key, though, is that the instruction should not insinuate that the trial court has

1. One variant of the instruction is called an "alternative courses of action" instruction, which states (with emphasis on the subjective terms added):

If you conclude by a preponderance of the evidence from [the opinions given by the expert witnesses] that two or more alternative courses of action *could have been* selected by the Defendant as *proper* under the circumstances and that she, in the reasonable exercise

of her judgment and consistent with the applicable standard of care, elected one of these *proper* alternatives, you *may* return a verdict in favor of the Defendant, even though you may believe that a better outcome *may* have resulted if an alternative course of action had been elected.

See *Amicus Brief on behalf of the West Virginia Trial Lawyers Association* at 3–4.

**500**

found the courses of action to be "accepted" or "appropriate."

The use of terms like "honest" or "best judgment" improperly introduce a "moral" element into the liability analysis. Virtually all errors of professional judgment are honest errors made in good faith. But the doctor's intent or state of mind is simply irrelevant in a negligence analysis.

Whether a method of treatment or course of action is "accepted" or "appropriate," and whether the defendant made an "honest" exercise of his/her "best judgment" choosing between those methods or courses, are all determinations which may be disputed by the witnesses, argued by the lawyers, and made final by the fact finder. The fact finder should not be distracted by subjectively-stated instructions which muddle the defendant's duty.

I therefore respectfully concur.